**BETTER GOVERNMENT BUREAU, INC., an Ohio Corporation, Plaintiff,**

v.

**Darrell V. McGRAW, Jr., et al., Defendants.**

**Civ. A. No. 2:94–0952.**

United States District Court, S.D. West Virginia, Charleston Division.

Oct. 16, 1995.

E. Joseph Buffa, Jr., Kopelman & Associates, Charleston, WV, Roger P. Furey and Michael B. Adlin, Arter & Hadden, Washington, DC, for plaintiff.

David P. Cleek, Cleek, Pullin, Knopf & Fowler, Charleston, WV, for defendants.

## *MEMORANDUM OPINION AND ORDER*

HADEN, Chief Judge.

Pending are the parties' cross motions for summary judgment. This matter is now fully briefed and postured for adjudication. The Court hereby GRANTS summary judgment to Plaintiff on the issue of qualified immunity. The Court further GRANTS summary judgment to Defendants on the official capacity claims alleged against them in Plaintiff's state law causes of action. With the exception of these rulings, the Court DENIES the remainder of the parties' cross motions for summary judgment.

## I. FACTUAL BACKGROUND

Plaintiff Better Government Bureau, Inc., (BGB) alleges it is a "watchdog" of government activities with a membership of forty-seven businesses and 304 individuals from various states. BGB commenced operations in August 1993 and asserts it monitors government activities and disseminates information about government policies impacting business. Plaintiff's president, Kenneth Nickalo, summarized the workings of BGB as follows:

> Where appropriate, we express our opinion in various public media and forums on matters of importance to our members and to the business community in general.
>
> . . . .
>
> The BGB has a procedure for its members to follow if they have complaints about the policies or activities of the government, or about the manner in which the member has been treated by the government.

Nickalo aff. ¶¶ 3, 5. BGB derives its income from the dues paid by its members.

In August 1994 a BGB member, Suarez Corporation Industries (SCI), registered a complaint with the BGB arising out of action taken against SCI by the West Virginia Attorney General concerning SCI's advertising practices.[1] Specifically, the Attorney General alleged SCI (1) violated the West Virginia Consumer Credit and Protection Act, *West Virginia Code* §§ 46A–1–101 *et seq.*, and (2) engaged in fraudulent activities with regard to direct mail marketing practices. SCI requested BGB to investigate its complaint and act accordingly.

BGB undertook preliminary investigative efforts with little apparent success. For instance, Nickalo asserts employees of the Attorney General's office refused BGB's requests under the Freedom of Information Act. Subsequently Plaintiff purchased time with three Charleston area radio stations to broadcast the following announcement on September 8, 1994:

THIS IS AN IMPORTANT ANNOUNCEMENT

The Better Government Bureau is investigating the actions of Attorney's General Darrell McGraw and Tom Rodd.

Voters already removed McGraw from the State Supreme Court because of his poor performance.

Now we are trying to obtain public information about the Attorney General under the "Freedom of Information Act", but it has been denied. What are McGraw and Rodd trying to hide?

If you have any information about Darrell McGraw, Tom Rodd or anyone in the Attorney General's office, please contact the Better Government Bureau toll free at 1–800–807–9881.

Nickalo aff. ex. E.

Approximately two weeks later, an article concerning BGB's activities appeared in the *Charleston Gazette*, a newspaper of general circulation in West Virginia. In part, the article quoted Nickalo as saying "the [BGB] plans to open a Charleston office and possibly start a West Virginia chapter." Nickalo also spoke of plans to lobby the Legislature and said BGB was aligning itself with the Christian Coalition. Nickalo was further reported to have said " '[w]e all have one thing in common: We're sick of the state government of West Virginia. . . . We think we can crack politics in West Virginia, use what we do in West Virginia as a model, and do what we'll do in West Virginia in other states.' " *Id.* ex. F. The article also spoke of a sharply critical newsletter distributed by BGB concerning Rodd and McGraw.

Consistent with this announcement, Plaintiff took steps to incorporate a West Virginia chapter of its organization under the name "Better Government Bureau, Inc." during the first week of October 1994. As an interim measure, BGB applied to the West Virginia Secretary of State for a certificate of authority to do business as a foreign corporation. That office refused the application, explaining Defendant McGraw had filed articles of incorporation the previous week for a company using the words "Better Government Bureau" as part of its name.[2] BGB later learned of events that preceded Defendant McGraw's incorporation of the challenged entity.

On September 30, 1994 Defendant McGraw instructed one of his employees to reserve the name Better Government Bureau with the West Virginia Secretary of State.[3]

---

1. The president of SCI, Benjamin Suarez, apparently has substantial ties to BGB. SCI contributes $150,000 toward BGB's activities and Mr. Suarez is serving a twenty-five year term on BGB's Board of Trustees. Two other members of the six-member Board are also employed by SCI.

2. The full corporate name of the entity formed by Defendant McGraw is "Better Government Bureau, Office of the Attorney General, State of West Virginia." The stationary for this entity appends the following language to this name: "a body politic a corporate instrumentality of government with limited agency and quasi-sovereign capacity." Pl's. Mot. for Sum. Jgt. ex. 15.

3. This notion had its genesis in a suggestion by Carol Jackson, a spouse of one of Defendant McGraw's employees, to one of Defendant McGraw's "constituent services" officers. The officer's notes from the conversation state as follows: "Steal name—form Better Government Bureau before they have a chance to do so." Lila J. Hill dep. at 27. When Ms. Hill reported the constituent's suggestion to Defendant McGraw, the latter admitted he "chuckled inwardly" and was "glad [his] people were being

The employee was informed by a clerk at the Secretary of State's office that anyone attempting to reserve the Better Government Bureau name was first required to see Donald L. Wilkes, Director of the Corporations Division. The employee was then turned away by the clerk due to Wilkes' absence.[4] When the employee returned to the Attorney General's office and informed Defendant McGraw of what transpired, the Attorney General instructed the employee to see Defendant Hechler personally about the matter. When the employee returned to the Secretary of State's office, Defendant Hechler personally escorted her to the Corporations Division. The employee then was permitted to reserve the "Better Government Bureau" name. Later in the day, the employee and Defendant McGraw prepared the necessary filings for the entity and they returned to the Secretary of State's office to seek incorporation. Defendant McGraw wrote a personal check to pay the incorporation fee.

On October 4, 1994 Defendant McGraw communicated with fifty-three attorneys general in various states and territories. His letter stated, in part, as follows:

> Please review the enclosed newspaper article, paying particular attention to paragraph 5B and the activities of the Better Government Bureau described therein.
>
> If your office becomes involved in a sweepstakes probe, you will encounter this corporation. To foreclose the possibility of such a corporation operating in your State, you may want to register the name of the Better Government Bureau as an agent for the Attorney General's office with the Secretary of State's Office or take other preventative measures.

Pl's. Mot. for Sum. Jgt. ex. 10.

Defendant McGraw forwarded a similar letter to the same parties on October 6, 1994. The letter alleged an SCI attorney "threatened violence" upon an assistant attorney general, and further read as follows:

> When you come up against these people, you should know that there is a possibility that their *modus operandi* might include a proclivity to violence.
>
> Please recall my recent letter, in which I recommended that you protect the name Better Government Bureau in your State, otherwise when you act to protect your consumers you will be attacked by a Better Government Bureau for doing so.

*Id.* ex. 12.

About the same time, Nickalo sent letters to both Defendants Hechler and McGraw seeking elimination of the obstacles BGB was encountering in its attempts to register its name in West Virginia. His efforts met with limited success. Wilkes advised Nickalo the BGB name conflicted with the name chosen by Defendant McGraw and was thus not available for use in West Virginia. Wilkes further advised Nickalo: "[c]onsent from the conflicting name holder is necessary to use a confusingly similar name." Nickalo aff. ex. G.[5] Further, Defendant Hechler advised Nickalo as follows: "As I understand you are already conducting business in Charleston,

---

innovative ... [and] thinking good." Darrell V. McGraw dep. at 99, 101. Defendant McGraw admits he knew his use of the Better Government Bureau name would prevent BGB from "com[ing] into West Virginia, giv[ing] birth to a new person and call[ing] it a West Virginia person." *Id.* at 103. Nevertheless, Defendant McGraw denies he intended to prevent BGB from attacking either him or his office.

**4.** Wilkes later explained an "administrative flag" had been placed on the words "Better Government Bureau," because Defendant Hechler had an interest in the name.

**5.** It appears Wilkes' concerns were well-founded. The record contains instances of actual confusion of the parties' similar marks. For example, the United States Postal Service delivered mail intended for BGB to the entity incorporated by Defendant McGraw. Rather than forwarding the mail to BGB, an official in Defendant McGraw's office sent the letter to the Postal Service and suggested the Postal Service assist the Attorney General's office in its investigation of Plaintiff's use of the mails.

Further, the Charleston area phone book contains two listings for the Better Government Bureau—one for Plaintiff's entity and one for Defendant McGraw's entity. This has confused directory assistance operators, who occasionally misdirect callers to the wrong entity. An official with Defendant McGraw's office wrote to the phone company and asked Plaintiff's designated name be listed in another fashion because "the likelihood of confusion and injury to the West Virginia Better Government Bureau is great." Pl's. Mot. for Sum. Jgt. ex. 14.

WV[;] you should consult with your attorney." Pl's. Mot. for Sum. Jgt. ex. 13. Plaintiff's continued efforts to obtain permission to do business in West Virginia under the mark "Better Government Bureau, Inc." have met similar obstacles.

The record suggests other possible intimidatory or retaliatory activity by Defendants. The Attorney General's office contacted a BGB member, Imperial Marketing, one of the one hundred plus companies sued by the Attorney General, to discuss settlement. As a precondition to settlement, the Attorney General's office suggested Imperial Marketing discontinue its membership in BGB. Imperial Marketing resigned its membership in BGB, sent a copy of the resignation letter to an official in the Attorney General's office, and requested it be kept confidential. Subsequently the letter was leaked to the *Charleston Gazette* and BGB alleges its publication has had a chilling effect on BGB's attempts to attract new members in West Virginia.

On October 28, 1994 Plaintiff filed a verified complaint alleging (1) state and federal unfair competition claims and (2) a denial of Plaintiff's right to free speech under both the First Amendment to the United States Constitution and Article III, Sections Seven and Sixteen of the West Virginia Constitution. On November 22, 1994 Plaintiff sought a temporary restraining order and preliminary injunction. The Court denied the requested relief on December 2, 1994. Following discovery, the parties filed the instant cross motions for summary judgment.

## II. THE LAW

### A. *Summary Judgment on the Unfair Competition and Constitutional Claims.*

■ The well-settled standard governing the disposition of a motion for summary judgment was recently restated by our Court of Appeals:

A moving party is entitled to summary judgment 'if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.' Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

A genuine issue exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.*

*Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* —— U.S. ——, ——, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994).

■ On all claims and defenses except qualified immunity and the official capacity state law claims, the Court concludes genuine issues of material fact remain extant.[6]

---

6. In their memorandum in support of summary judgment, Defendants offered a one-page argument asserting the federal unfair competition claim alleged by Plaintiff was not covered under 15 U.S.C. § 1125(a), the applicable statute. Defendants assert Congress intended § 1125(a) to protect *consumers* from deceptive trade practices. Defendants then argue (1) consumers in West Virginia do not pay for the Attorney General's services; (2) the Attorney General is not engaged in "competition"; and (3) the Attorney General does not profit from the operation of the Bureau it created. In response, Plaintiff cites § 1125(a)(2), which provides "[a]ny State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter

## B. *Immunity Defenses.*

### 1. Introduction

To address the immunity issues asserted by Defendants adequately, the Court should discuss briefly: (1) Plaintiff's causes of action; (2) the Defendants named in those causes of action; and (3) the capacity or capacities in which each Defendant is named. Of particular importance is the capacity in which each Defendant is sued. As a general matter, personal or "individual" capacity suits may affix personal liability on government officials for actions taken under color of state law. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). In contrast, official capacity suits against an officer usually are treated as actions against the governmental entity employing the official. *Id.*

Plaintiff has named Defendant McGraw in his personal and official capacities and Defendant Hechler in his official capacity under the claims alleging federal and state constitutional violations. Plaintiff seeks prospective injunctive relief against Defendant McGraw in both his personal and official capacities and against Defendant Hechler in his official capacity. Plaintiff also seeks both compensatory and punitive damages against Defendant McGraw in his personal capacity. No constitutional claims are alleged against Defendant Better Government Bureau.

As for the federal unfair competition claim under 15 U.S.C. § 1125(a), Plaintiff has named only Defendants McGraw and Better Government Bureau. As noted by Plaintiff in a conference call with the Court on September 29, 1995 the capacity in which these two Defendants are sued has been rendered largely meaningless by the 1992 congressional abrogation of Eleventh Amendment immunity for § 1125(a) claims. *See infra* note 9. These two Defendants may now be sued, regardless of their respective capacities, for a broad array of damages and injunctive relief. *Id.* Accordingly, the Court will treat each Defendant as being sued in his or its official capacity under § 1125(a).

Plaintiff has named Defendant McGraw in his personal and official capacity and Defendant Better Government Bureau in its "personal corporate capacity" in its state common law unfair competition claims.[7] Plaintiff is somewhat ambivalent as to whether it seeks anything beyond prospective injunctive relief against Defendants McGraw or Better Government Bureau under this cause of action. In one of its briefs, however, Plaintiff claims it "only seeks damages on its *personal* capacity constitutional claims, and its Lanham Act claims." Mem. in Opp. at 13 (emphasis in original). Accordingly, the Court will proceed to resolve the immunity issues on this representation.

### 2. Eleventh Amendment Immunity

Defendants assert they are partially immune from defending because of the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens

---

in the same manner and to the same extent as any nongovernmental entity." *Id.* BGB asserts Defendant McGraw's use of the confusingly similar name interferes with its efforts (1) to attract and retain dues-paying members; and (2) to act on behalf of its members. Faced with this response, Defendants fail to mention the argument in their reply brief. Defendants also do not appear to assert the argument as a defense to liability in the pretrial order. The Court therefore concludes Defendants have abandoned this particular challenge.

The Court, however, would note a related issue. Section 1125(a)(1) provides, in pertinent part, the infringing "services" must be used "in commerce." *Id.* The Lanham Act admittedly accords "in commerce" a broad definition. 29 U.S.C. § 1127. Nevertheless, the definition is not without boundaries. *Id.* The proof is not sufficiently developed on the breadth and type of activity for which Defendant McGraw intends to use the entity he created. To prevail on this claim Plaintiff must prove Defendants used or will use the mark "in commerce" under § 1125(a).

7. Regardless of the personal capacity label applied to this claim against the challenged entity, the Court concludes the entity is an arm of the state. The Court thus concludes the entity may properly interpose an Eleventh Amendment immunity defense. *See infra* § II.B.2.

or Subjects of any Foreign State."[8] U.S. Const. amend. XI.

■ In *Gray v. Laws,* 51 F.3d 426 (4th Cir.1995), the Court of Appeals restated the well-established parameters of Eleventh Amendment immunity as follows:

Like the state itself, state officers acting in their official capacity are also entitled to Eleventh Amendment protection, because 'a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office,' and '[a]s such, it is no different from a suit against the State itself.'

*Id.* at 431 (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (citations omitted)). *Gray* also noted the equally well-settled and substantial caveat to this general rule: "A state and its officers are not entitled to Eleventh Amendment protection, however, where a plaintiff seeks only prospective, injunctive relief." *Id.* at 430 n. 1; *see also, e.g., Edelman v. Jordan,* 415 U.S. 651, 664–68, 94 S.Ct. 1347, 1356–58, 39 L.Ed.2d 662 (1974). It should be noted, however, the *Edelman* exception has no application when the state, its officers or instrumentalities are sued for injunctive relief on the basis of state, rather than federal, law. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 106, 117, 121, 104 S.Ct. 900, 911, 917, 919, 79 L.Ed.2d 67 (1984); *Harker v. State Use Industries,* 990 F.2d 131, 132 n. 1 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993); *Westinghouse Elec. v. West Virginia Dep't of Highways,* 845 F.2d 468, 469 (4th Cir.), *cert. denied,* 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 116 (1988).

■ The *Edelman* exception is clearly applicable to Plaintiff's federal constitutional claims against Defendants McGraw and Hechler.[9] Because Plaintiff seeks only prospective injunctive relief against these Defendants in their official capacities, Eleventh Amendment immunity is inapplicable.

■ A different result obtains, however, in regard to Plaintiff's official capacity claims against (1) Defendants McGraw and Hechler on the state constitutional claim and (2) Defendant McGraw and the challenged entity on the common law unfair competition claim. Consistent with *Pennhurst* and its progeny, the Court concludes Defendant Hechler and the challenged entity are immune from suit on these two claims, as they are sued only in their official capacities. Further, to the extent Defendant McGraw is sued in his official capacity on the two claims, he too is entitled to Eleventh Amendment immunity. The personal capacity claims against Defendant McGraw on the two

8. After considerable pre-ratification debate, state representatives were persuaded their thirteen individual sovereigns could not be sued in federal court without consent. 2 *Civil Actions Against State and Local Government* § 10.1 (John L. Craig et al., 2d ed. 1992). The United States Supreme Court disagreed in *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793) and held it constitutional for a citizen of one state to sue another state in federal court absent state consent. *Chisholm* was roundly criticized, and five years later the Eleventh Amendment was ratified to abrogate the unpopular decision. Charles A. Wright, *Law of Federal Courts* § 48 (5th ed. 1994).

9. Defendants are not entitled to Eleventh Amendment immunity for Plaintiff's federal unfair competition claims under 15 U.S.C. § 1125(a). Section 1125(a) was amended on October 27, 1992 to provide, in part, as follows:

As used in this subsection, the term 'any person' includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity.

Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

*Id.* § 1125(a)(2); *see also id.* § 1122 (stating, *inter alia,* the remedies available to plaintiffs aggrieved by a state or one of its officers includes injunctive relief, actual damages, profits, costs and attorney's fees "and ... any other remedies provided" under the Trademark Act).

This amendment to the Trademark Act completely abrogates Eleventh Amendment immunity of states and their officials and instrumentalities. *See, e.g.,* Senate Judic. Comm., S.Rep. No. 280, 102d Cong., 2d Sess. 2 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3087, 3088 (1993); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25.21[2] (3d ed. 1995). Accordingly, both Defendant McGraw and Defendant Better Government Bureau may be subjected to comprehensive legal and equitable remedies under § 1125(a).

causes of action are not affected by this analysis, and so remain viable.

### 3. Qualified Immunity

■ Only Defendant McGraw is sued personally for damages arising out of the constitutional claims. Defendant McGraw argues he is entitled to qualified immunity for these alleged violations.[10] The Court disagrees.

■ Qualified immunity is designed "to limit the deleterious effects that the risks of civil liability would otherwise have on the operations of government." *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir.1995) (en banc); *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Akers v. Caperton*, 998 F.2d 220, 225–26 (4th Cir.1993). The doctrine protects " 'all but the plainly incompetent or those who knowingly violate the law....' " *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir.1992) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). As stated in *Pinder*, the defense "prevents officials from being blindsided by liability derived from newly invented rights or new, *unforeseen* applications of pre-existing rights. In short, officials cannot be held to have violated rights of which they could not have known." *Pinder*, 54 F.3d at 1173 (emphasis added); *see also Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). As a matter of timing, and in part to achieve the goal of not unnecessarily subjecting public officials to the burdens attendant in civil litigation, the question of qualified immunity should be decided *"as a threshold matter"* in the litigation. *See, e.g.,*

*Torcasio v. Murray*, 57 F.3d 1340, 1352 (4th Cir.1995) (emphasis in original).

■ The general contours of the defense are well-defined. In a nutshell, "[e]ven officials who violate the Constitution are to be accorded qualified immunity and so escape liability for money damages if, in the performance of discretionary duties, 'their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known.' " *Buonocore v. Harris*, 65 F.3d 347, 352 (4th Cir.1995) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)); *see also Torcasio*, 57 F.3d at 1343; *Pinder*, 54 F.3d at 1173; *DiMeglio v. Haines*, 45 F.3d 790, 794 (4th Cir.1995).[11] This inquiry resolves itself into two distinct analytical steps.

■ First, the Court must decide the purely legal question of whether the challenged actions violated clearly established law. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *DiMeglio*, 45 F.3d at 794. In making this determination, the Court focuses on the law as it existed at the time of the alleged violation, *see, e.g., Buonocore*, 65 F.3d 347, 353; *Torcasio*, 57 F.3d at 1343, and "examines the facts alleged *by the plaintiff*, not those asserted by the defendant." *Buonocore*, 65 F.3d 347, 357 (emphasis in original); *DiMeglio*, 45 F.3d at 794, 803.[12] Second, the Court must determine "whether a reasonable person in the official's position would have known that his conduct would violate" Plaintiff's rights. *Torcasio*, 57 F.3d at 1343; *Pinder*, 54 F.3d at 1169.

---

**10.** Defendant McGraw appears to argue he is entitled to qualified immunity for any and all "personal capacity claims" asserted against him. Defs.' Mem. at 16–17. Defendants rightly concede the qualified immunity defense "does not apply to official capacity suits." *Id.* at 17; *see, e.g., Graham*, 473 U.S. at 167, 105 S.Ct. at 3106; *Biggs v. Meadows*, 66 F.3d 56, 60–61 (4th Cir. 1995). As noted, the only other cause of action for which damages are sought fall under 15 U.S.C. § 1125(a) against Defendants McGraw and Better Government Bureau. Since the Court treats the § 1125(a) claim as an action against the officer and instrumentality named, qualified immunity does not attach.

**11.** None of the parties suggest there is any substantive difference between the federal and West Virginia standards for qualified or "good faith" immunity. While the Court need not reach the question, it appears the two standards are identical. *See, e.g.,* Syl. Pt. 1, *State v. Chase Secs., Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992).

**12.** Defendants seem to misapprehend this proposition. For instance, Defendants state as follows in their Memorandum in Support of Summary Judgment: "Admittedly, there is no immunity for fraudulent or malicious acts but here, *although these allegations are made,* they are not supported by any facts." *Id.* at 19 (emphasis added).

Perhaps the most difficult task for the Court in ruling on the question of qualified immunity, however, involves the prelude to these two analytical steps: The Court must identify the " 'specific right allegedly violated.' " *Buonocore*, 65 F.3d 347, 353 (quoting *Pritchett*, 973 F.2d at 312); *Torcasio*, 57 F.3d at 1343. In making this determination, " ' "the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." ' " *DiMeglio*, 45 F.3d at 803 (quoting *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir.1994) (Powell, J.)) (quoting *Pritchett*, 973 F.2d at 312). In other words, the specific right asserted must have been "clearly established *in a particularized and relevant sense.*" *Pinder*, 54 F.3d at 1173 (emphasis added); *see DiMeglio*, 45 F.3d at 804.

Nevertheless, "it is important not to be overspecific—there need not be a prior case directly on all fours with the facts presented to the official—but 'in light of the pre-existing law the unlawfulness' of [a defendant's] conduct must have been 'apparent.' " *Id.* at 1173 (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039); *see DiMeglio*, 45 F.3d at 804. One of the Fourth Circuit's most recent qualified immunity decisions illuminates this difficult balancing inquiry:

> Accordingly, [plaintiff] has alleged the violation of a right protected by the Fourth Amendment. We would so hold even if there were no reported opinion directly on point. This is so because there is no requirement that the 'exact right allegedly violated' be previously 'specifically recognized by a court' in order for it [to] be held ' "clearly established" for qualified immunity purposes.' *Rather,* ' "[c]learly established" in this context includes not only specifically adjudicated rights but those manifestly included within more general applications of the core constitutional principle invoked.' "The right to be free from government officials facilitating a private person's general search of the sort [plaintiff] alleges was conducted here, is 'manifestly included' within 'core' Fourth Amendment protection."*

*Buonocore*, 65 F.3d 347, 356–57 (emphasis added) (citations and footnote omitted); *see also Pritchett*, 973 F.2d at 314–15.

Accordingly, the Court's first task is to identify the specific right allegedly violated by Defendant McGraw. Defendant McGraw seems to suggest his mere innocent incorporation of a putative state agency using a name similar to that of Plaintiff does not contravene clearly established law. Were this the full extent of Defendant McGraw's alleged conduct, the Court would be inclined to agree. Of course, Plaintiff's allegations, and even some undisputed matters of record, paint a markedly different version of events.

Plaintiff's sequential allegations of retaliatory conduct are quite disturbing. Initially, Plaintiff publicly criticized Defendant McGraw and his office, *inter alia*, for not releasing information requested pursuant to the Freedom of Information Act. Plaintiff then publicized its plans to start a West Virginia chapter and begin full-scale operations to lobby the West Virginia Legislature because, in part, its members were "sick of the state government of West Virginia."

Within days after these plans were announced, Defendant McGraw acted on a suggestion he "[s]teal" Plaintiff's name so as to thwart or at least hamper Plaintiff's expected attempts to begin wide-scale operations in West Virginia. Defendant McGraw found this suggestion "innovative" and concedes he "chuckled inwardly" at the idea. Defendant McGraw also admits he knew his use of the Better Government name would prevent BGB from "com[ing] into West Virginia, giv[ing] birth to a new person and call[ing] it a West Virginia person." As noted earlier in this Opinion, the record reflects Defendant McGraw went to great lengths to preempt Plaintiff's use of the name, thus preventing it from operating in West Virginia as a West Virginia entity. Defendant McGraw personalized these events, tendering his personal check for the entity's incorporation fee.

Next Defendant McGraw sent letters to his fellow attorneys general encouraging them to undertake the same or "other preventative measures ... [t]o foreclose the possibility of such a corporation operating in [their] State[s]." To underscore the urgency

of this appeal, Defendant McGraw sent a second letter to the attorneys general, warning of eventual "attack[s]" by Plaintiff against them. Defendant McGraw conceded the "attack[s]" he was speaking of were, at least in part, Plaintiff's "negative" comments directed at McGraw and his office through the media. *See, e.g.,* McGraw dep. at 43 (stating in regard to Plaintiff's radio announcement "[t]his is a political thing, all right, and it's intended to evoke a negative reaction. And so copy that is used in the political arena to evoke a negative reaction against a public figure is in the business considered to be an attack.").

Perhaps most troubling are the allegations concerning Imperial Marketing. Defendant McGraw's agents influenced Imperial Marketing to discontinue membership in BGB as a condition to settlement of an action the Attorney General had instituted against Imperial. When Imperial agreed to do so, it sent a copy of the resignation letter to the Attorney General's office and asked the letter be kept confidential. Anonymously, the letter was leaked to the press.

Taking Plaintiff's allegations as true, there is an obvious cause and effect relationship. Plaintiff criticized Defendant McGraw and his office, even suggesting Defendant McGraw's performance on the Supreme Court of Appeals of West Virginia was less than stellar. Plaintiff then decided to begin operations in West Virginia and presumably continue engaging in speech critical of Defendant McGraw. In short order, Defendant McGraw retaliated against BGB and attempted to thwart BGB's operational efforts so as to stem the latter's continued criticism of him.

Moulding these facts to the appropriate level of specificity, the issue is whether the law was clearly established at the time of Defendant McGraw's alleged actions that a public official could not engage in retaliatory conduct designed to hamper or thwart a citizen's rights to free speech under the federal and state constitutions. As Judge Posner observed in a recent qualified immunity decision, "[t]o ask the question is pretty much to answer it." *Nelson v. Streeter,* 16 F.3d 145, 148 (7th Cir.1994).

■ The Supreme Court has held "it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions...." *Bridges v. California,* 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941). Additionally, the Court has observed our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964); *see also Korb v. Lehman,* 919 F.2d 243, 247 (4th Cir.) (stating "[t]he protection of citizens' right to speak publicly on matters of public concern ... is at the very heart of the First Amendment."), *cert. denied,* 502 U.S. 808, 112 S.Ct. 51, 116 L.Ed.2d 28 (1991).[13]

■ For the above reasons, governmental officials are prohibited from interfering with, or retaliating against, a citizen's exercise of his or her First Amendment rights. *Perry v. Sindermann,* 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972) (stating "[t]he respondent has alleged that his nonretention was based on his testimony before legislative committees and his other public statements critical of the Regents' policies. And he has alleged that this public criticism was within the First ... Amendment['s] protection of freedom of speech. *Plainly,* these allegations present a bona fide

---

13. The fact Plaintiff is not an individual citizen, but rather an association of members, certainly does not lessen the First Amendment protections to which it is entitled. *See, e.g., Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 3251, 82 L.Ed.2d 462 (1984) (stating "we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, eco- nomic, educational, religious, and cultural ends."); *Smith v. Arkansas State Highway Employees,* 441 U.S. 463, 464, 99 S.Ct. 1826, 1827, 60 L.Ed.2d 360 (1979) (stating "[t]he First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances. And it protects the right of associations to engage in advocacy on behalf of their members.").

constitutional claim.") (emphasis added); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (stating an employee may "establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms."); *American Civil Liberties Union v. Wicomico County*, 999 F.2d 780, 785 (4th Cir.1993) (stating "[r]etaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper.").[14]

■ This principle is not only "clearly established" for qualified immunity purposes, but is also perhaps one of the more well-settled principles of constitutional jurisprudence. *See, e.g., Dobosz v. Walsh*, 892 F.2d 1135, 1141 (2nd Cir.1989) (holding "[b]ecause the proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established, we conclude [defendant] is not entitled to qualified immunity with respect to [plaintiff's] First Amendment claim.") (citations omitted); *Johnston v. City of Houston*, 14 F.3d 1056, 1061 (5th Cir.1994) (dealing with a plaintiff claiming he was arrested in retaliation for exercising his First Amendment rights and the court stating plaintiff "asserted gross infringements of fundamental constitutional protections" that, if proven to be true, demonstrated defendants were "either 'plainly incompetent or knowingly violated the law.'").[15] Defendant

McGraw practically concedes the point by stating "[i]t is true that a person may not be retaliated against or lose some right as a result of retaliation for the exercise of a First Amendment right." Defs.' Mem. in Supp. at 4.

■ While there was no case directly on point at the time of these actions that would warn-off Defendant McGraw from engaging in such activity, case-specific precedent is not required. Like the Court in *Buonocore*, this Court concludes the right to engage in purely political speech without fear of retaliatory tactics by a state attorney general is "'manifestly included within more general applications of the core constitutional principle,'" which provides a state official may not burden or otherwise retaliate against a citizen for public criticism of the official's actions. *Buonocore*, 65 F.3d 347, 356. The Court thus concludes Defendant McGraw's actions contravened clearly established law.[16] To rule otherwise would ignore the *ad hominem* appeal of cornbread and beans.

■ The second step in the qualified immunity analysis is more straightforward. The Court must ascertain whether a reasonable official in Defendant McGraw's position would have known his conduct violated Plaintiff's constitutional rights. The Fourth Circuit in *DiMeglio* noted:

Only if a court determines that the plaintiff has alleged a violation of a right clearly established at the time the actions occurred should it proceed to determine

---

**14.** The rationale for this rule is obvious: "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. *This would allow the government to 'produce a result which [it] could not command directly.'*" *Perry*, 408 U.S. at 597, 92 S.Ct. at 2697 (quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)) (emphasis added).

**15.** Once again, the parties do not suggest the law relating to Plaintiff's claims under Article III, Sections Seven and Sixteen of the West Virginia Constitution is any different or any less clearly established than the federal precedent discussed above. *See, e.g., McClung v. Marion County Comm'n*, 178 W.Va. 444, 450, 360 S.E.2d 221, 227 (1987); *City of Fairmont v. Retail, Wholesale, & Dep't Store Union*, 166 W.Va. 1, 9, 283 S.E.2d

589, 593 (1980). Indeed, the Justice McGraw himself stated in *City of Fairmont:* "In West Virginia the right to protest against the policies of government and the right to seek redress from the government without fear of reprisal are as fundamental to our law and good sense as 'cornbread and beans' are to our diet." *City of Fairmont*, 166 W.Va. at 20, 283 S.E.2d at 599 (McGraw, J., concurring).

**16.** This is precisely the type of case Judge Posner described when he stated "the absence of [many] reported case[s] with similar facts demonstrates nothing more than wide-spread compliance with well-recognized constitutional principles." *Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994). The conduct alleged here likely is without precedent for obvious reasons, and it is doubtful such actions will be repeated in the future.

whether a reasonable person in the official's position would have known that his actions violated that right. *When the inquiry proceeds to this point, 'the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct;'* however, the defendant may still be able to show 'extraordinary circumstances' and 'prove that he neither knew nor should have known of the relevant legal standard.'

*DiMeglio*, 45 F.3d at 794–95 n. 1 (emphasis added) (citations omitted). Defendant McGraw has failed to demonstrate any extraordinary circumstances to forestall judgment as a matter of law on the existence of qualified immunity. Accordingly, the Court concludes Defendant McGraw knew or should have known his conduct was in violation of Plaintiff's clearly established constitutional rights.

As stated in *Pinder*, "[t]he linchpin of qualified immunity is objective reasonableness." *Pinder*, 54 F.3d at 1173; *DiMeglio*, 45 F.3d at 804 (stating " 'objective legal reasonableness' . . . is the touchstone of *Harlow [v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ].''). Taking Plaintiff's allegations as true, Defendant McGraw's actions simply do not pass muster under this standard. The unlawfulness of his conduct should have been apparent to him. Accordingly, the Court concludes as a matter of law Defendant McGraw is not entitled to qualified immunity.[17]

## III. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS summary judgment to Plaintiff on the issue of qualified immunity. The Court further GRANTS summary judgment to Defendants on the official capacity claims alleged against them in Plaintiff's state law causes of action. With the exception of these rulings, the Court DENIES the remainder of

---

**17.** There is a second reason why Defendant McGraw is not entitled to qualified immunity. His actions were beyond the permissible realm of his discretionary duties and thus outside his scope of authority. Plaintiff complains vigorously of Defendant McGraw's allegedly unauthorized creation of the corporate entity at issue and his usurpation of the Better Government Bureau name in the process. Was the Attorney General authorized to create the challenged entity?

In *State ex rel. Fahlgren Martin v. McGraw*, 190 W.Va. 306, 438 S.E.2d 338 (1993), the Supreme Court of Appeals of West Virginia had occasion to restate the well-settled scope of the Attorney General's powers. Quoting then Justice McGraw's opinion for the Court in *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909 (1982), the Supreme Court observed and held: 'By the provisions of our present constitution, the Attorney General is once again an officer of the executive department. However, his return to the executive department did not revive the common law powers of his office. The people of West Virginia specifically expressed their intent that the Attorney General should not exercise those powers by providing that he "shall perform such duties as may be prescribed by law.". . . The plain effect of the provision is to limit the powers of the Attorney General to those conferred by law laid down pursuant to the constitution. Consequently we conclude that the powers and duties of the Attorney General are specified by the constitution and by rules of law prescribed pursuant thereto.'

*Fahlgren Martin*, 190 W.Va. at 312, 438 S.E.2d at 344 (quoting *Manchin*, 170 W.Va. at 785, 296

S.E.2d at 915). After reviewing this analysis, the Supreme Court in *Fahlgren Martin* concluded the powers of the Attorney General are "limited to what is conferred by law through statute and the Constitution." *Id*, syl. pt. 1; Syl. Pt. 3, *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 461 S.E.2d 516, 522 (W.Va.1995) (stating "the Attorney General's powers are limited to those *specifically* conferred by statute.") (emphasis added).

Defendant McGraw cites only *West Virginia Code* § 46A–7–102 as authorization to create the challenged entity. This statute permits the Attorney General, *inter alia*, (1) to receive and act on consumer complaints; (2) to counsel persons on their rights and duties under the West Virginia Consumer Credit and Protection Act; and (3) to establish programs for the education of consumers with respect to credit practices and problems. *Id.* § 46A–7–102(1)(a) to (c). Defendant McGraw reads these sections as necessarily authorizing his creation of corporate persons, as long as such entities are designed at least in part to accommodate these three statutory purposes. The Court disagrees. If the Attorney General could so easily read these three narrow powers into an expansive statutory grant of authority to create a quasi-governmental corporate entity, the constitutional and legislative limits on his powers would soon be vapor and smoke. Given that Defendant McGraw has failed to identify a "specific" legislative enactment authorizing his actions here, the Court concludes he exceeded the scope of his authority as Attorney General of West Virginia.

the parties' cross motions for summary judgment. The Court ORDERS this case to proceed to trial.