**BETTER GOVERNMENT BUREAU, INC., an Ohio corporation, Plaintiff,**

v.

**Darrell V. McGRAW, Jr., Attorney General, State of West Virginia, Personally and in his Official Capacity; Better Government Bureau, Office of the Attorney General, State of West Virginia, A Body Politic, A Corporate Instrumentality of Government with Limited Agency and Quasi–Sovereign Capacity; and Ken Hechler, Secretary of State, in His Official Capacity, Defendants.**

**Barbara H. Allen, Interested Party.**

No. 2:94–0952.

United States District Court, S.D. West Virginia, Charleston Division.

April 25, 1996.

E. Joseph Buffa; Kopelman & Associates, Charleston, WV, Roger P. Furey, Michael B. Adlin; Arter & Hadden, Washington, DC, for plaintiff.

David P. Cleek, Cleek, Pullin, Knopf & Fowler, Charleston, WV, for defendants.

Michael C. Allen, Barbara H. Allen; Allen & Allen, Charleston, WV, for Barbara H. Allen.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is (1) Better Government Bureau's (BGB) motion for an order to show cause why Deponent Barbara H. Allen should not be held in civil contempt; (2) Defendants' motion to stay imposition of contempt sanctions on Ms. Allen pending appeal; and (3) Ms. Allen's informal stay request. After careful consideration of the submitted materials and the arguments and testimony adduced at a March 22, 1996 hearing on the show cause motion, Ms. Allen is **ADJUDGED** to be in civil contempt of a March 5, 1996 Order of the Magistrate Judge and a March 8, 1996 Order of this Court. Defendants' motion to stay and the informal stay request are **DENIED**.

### I. FACTUAL AND PROCEDURAL BACKGROUND

On October 28, 1994 BGB commenced this action alleging (1) state and federal unfair competition claims; and (2) a denial of BGB's right to free speech under both the First Amendment to the United States Constitution and Article III, Sections Seven and Sixteen of the West Virginia Constitution. BGB asserted that in retaliation for its scathing public criticism of McGraw, McGraw acted to prevent it from doing business in West Virginia. The crux of BGB's allegations was that McGraw retaliated against it for exercising its right to free speech. Following discovery, both parties moved for summary judgment. The Court held, *inter alia*, McGraw was not

entitled to qualified immunity on the constitutional claims asserted by BGB.

In the portion of the ruling denying qualified immunity to McGraw, the Court noted "[BGB's] sequential allegations of retaliatory conduct are quite disturbing." *Better Gov't Bureau, Inc. v. McGraw,* 904 F.Supp. 540, 551 (S.D.W.Va.1995). A brief recitation of the allegations is set forth below, and the full text of the Court's Memorandum Opinion and Order, which sets forth the history of this case in detail, is attached to this Opinion. The reader is referred also to the Supplemental Memorandum Opinion and Order entered this date, revisiting the qualified immunity issue.

BGB is an Ohio corporation and a self-characterized "watchdog" of government activities. It boasts a membership of forty-seven businesses and 304 individuals from various states. In September 1994, BGB publicly criticized Attorney General McGraw and his office in the Charleston media, *inter alia,* for not releasing information requested pursuant to the Freedom of Information Act. BGB then publicized its plans to incorporate a West Virginia chapter and begin full-scale operations to lobby the West Virginia Legislature because, in part, its members allegedly were "sick of the state government of West Virginia."

Within days after these plans were announced, Attorney General McGraw acted on an individual's suggestion he "[s]teal" BGB's name by incorporating a similarly named entity with the Secretary of State's office so as to thwart or at least hamper BGB's expected efforts to begin wide-scale operations in West Virginia. The Attorney General found this suggestion "innovative" and concedes he "chuckled inwardly" at the idea. McGraw also admits he knew his use of the Better Government moniker would prevent BGB from "com[ing] into West Virginia, giv[ing] birth to a new person and call[ing] it a West Virginia person." The record reflects McGraw's office went to great lengths to preempt BGB's use of the name and to prevent it from operating as a West Virginia

entity. McGraw also drew his personal check to pay his entity's incorporation fee.

McGraw also contacted his fellow attorneys general by letter, encouraging them to undertake the same or "other preventative measures ... [t]o foreclose the possibility of such a corporation operating in [their] State[s]." To underscore the urgency of this appeal, McGraw forwarded a second letter to his peers in other states, warning of eventual "attack[s]" by BGB against them. McGraw conceded the "attack[s]" he was speaking of were, at least in part, BGB's "negative" comments directed at McGraw and his office through the media. *See, e.g.,* McGraw dep. at 43 (stating in regard to BGB's radio announcement "[t]his is a political thing, all right, and it's intended to evoke a negative reaction. And so copy that is used in the political arena to evoke a negative reaction against a public figure is in the business considered to be an attack.").

Perhaps most troubling to the Court, however, were the allegations concerning an entity known as Imperial Marketing. It appears McGraw's employees influenced Imperial to discontinue membership in BGB as a condition to settlement of litigation the Attorney General had instituted against Imperial. When Imperial agreed, it sent a copy of the resignation letter to the Attorney General's office and asked the letter be kept confidential. Anonymously, the letter was leaked to the press.

Following the Court's denial of qualified immunity to McGraw, he noticed an appeal to the Fourth Circuit on October 23, 1995. This Court then stayed the litigation pending the outcome of the interlocutory appeal.

In January 1996, BGB moved the Court to vacate its Memorandum Opinion and Order on the qualified immunity issue and to reopen discovery based on newly discovered evidence. The alleged new evidence arose from copies of two interoffice memoranda secured by BGB, one of which was received by BGB's president, Kenneth Nickalo, from an employee in McGraw's office.[1] The memoranda were dated immediately prior to McGraw's incorporation of his Better Gov-

---

1. The other memorandum, which was a response to the first, was produced by Defendants for the first time after BGB notified them it had secured the first memorandum independent of discovery.

ernment Bureau entity. The first memorandum was from Assistant Attorney General Daynus Jividen to Defendant Ken Hechler, Secretary of State of West Virginia, as follows:

> The Attorney General's Office anticipates that an organization called the Better Government Bureau, out of Canton, Ohio, will shortly seek registration, through your office, in order to conduct its alleged business in the State of West Virginia. When the Better Government Bureau attempts registration the Attorney General requests your office to resist and refuse such registration on the grounds that the Better Government Bureau's attempt to ply its business in our state constitutes a fraud and a deceit.
>
> Also, please inform me when the organization's application is received by your office.

Ex. A to Pl.'s Mem. to Vacate and Reopen.[2]

Defendant Hechler's response is damaging to McGraw's interests:[3]

> In response to your memorandum of September 26, *and after personal discussion with the Attorney General,* I will be pleased to inform you when the Better Government Bureau actually attempts to register with the Secretary of State's office. The issue of resisting and refusing such registration is more complicated that [sic] I at first imagined.
>
> *I do not recall any instance when any organization has been denied registration because of its political activity.* You [sic] memorandum refers to the BGB's 'attempt to ply its business in our state constitutes a fraud and a deceit.' Without passing judgment as to whether this would constitute sufficient grounds for resisting and refusing registration, I would ask that you spell out in writing the fraud and deceit to which you refer in your September 26 memorandum.
>
> I look forward to working with you on this issue, *with the understanding that when an organization is in good standing in our neighboring state of Ohio, that makes it very difficult to deny registration in West Virginia.* However, I will be pleased after receiving your response to this memorandum to consider this issue further *within the confines of the law* which governs our corporate chartering.

Ex. B to Pl.'s Mem. to Vacate and Reopen (emphasis added).

The significant probative value of these memoranda to support BGB's claims is readily apparent. Unfortunately, they were not produced or disclosed by Defendants to BGB during the regular discovery period.

Following a January 29, 1996 remand Order from the Court of Appeals to permit further discovery into the memoranda, this Court reopened discovery for the limited purpose of, *inter alia,* allowing BGB to take discovery on issues relating to the existence of the two documents and efforts of anyone to destroy or conceal them.

## II. DISCUSSION

When BGB sought discovery from Ms. Allen, who was appointed recently by McGraw to specially investigate matters relating to the memoranda, she resisted production on grounds of attorney-client privilege, work product privilege and a putative investigative privilege. The reasons underlying the Court's subsequent rejection of the asserted privileges are fully discussed in the Magistrate Judge's Order of March 5, 1996 and this Court's affirmance of that Order on

---

**2.** When BGB's president met with the custodian of the memoranda, a legal secretary assigned to Jividen, she allegedly told Nickalo (1) she typed the memorandum from a handwritten copy prepared by Jividen about ten to fifteen minutes after his meeting with McGraw and another official in the office; (2) she hand-delivered the memorandum, as instructed, to Defendant Hechler; (3) then she complained to Jividen about the propriety of the memorandum; and (4) Jividen told her to destroy all copies of the document. The employee, however, retained a copy.

These allegations have been developed in subsequent discovery.

**3.** The Court is not alone in its conclusion about the significance of the after-the-fact disclosure of the Jividen and Hechler memoranda. Defendant Hechler admitted that when he discussed the untimely appearance of the two memoranda with Jividen a few months ago, the latter stated " 'there may be a little of the rocky road about this[.]' " Deposition of Ken Hechler at 50.

March 8, 1996.[4] While the Magistrate Judge had ample reasons for his complete rejection of the attorney-client and thus the investigative privilege, it is instructive to illuminate at least two considerations justifying this action, mentioned briefly in footnote 1 of the March 8 Order.

First, the retention of Ms. Allen in the alleged capacity of an attorney is of critical importance to assertion of the attorney-client privilege. *See Cameron v. General Motors Corp.*, 158 F.R.D. 581, 584 (D.S.C.1994) (noting the privilege only applies if the person to whom the communication was made (a) is a member of the bar of a court or his subordinate; and (b) is acting as a lawyer in connection with the communication); *see also United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir.1984).

Given the circumstances attendant to case developments in recent months, the Court is concerned about the bonafides of McGraw's claim that Barbara Allen was hired and retained as an attorney. For instance, in Ms. Allen's affidavit, attached as Exhibit 1 to Deponent's Response in Opposition to BGB's Motion to Enforce and to Compel, she discusses the circumstances surrounding her retention. She alludes to a meeting with officials in the Attorney General's office and asserts that at that meeting she agreed to undertake legal representation of the Attorney General with respect to the two memos and other matters. Ms. Allen flatly states her conclusion she was retained as an attorney from the moment she accepted employment.[5] The circumstances surrounding her hiring, however, make this assertion questionable.

For instance, the day after her meeting with the officials at McGraw's office, she received an engagement letter by hand delivery. Defendants followed this missive by a second letter of clarification, faxed almost contemporaneously, providing Ms. Allen was retained in her "capacity as a lawyer." Based on this, as well as the chronology of events set forth above, the Court infers and concludes Ms. Allen was retained, at least in part, in an attempt to shield relevant and discoverable information from disclosure to the opposing party.

The second consideration militating against assertion of the privileged information is equally weighty. Because "the government has a strong interest in safeguarding citizens' civil rights and upholding the integrity of state law enforcement institutions, impediments to the full disclosure of the facts in a § 1983 case are not favored." *Skibo v. City of New York*, 109 F.R.D. 58, 64 n. 1 (E.D.N.Y.1985). As noted in *American*

---

4. In their motion to stay, Defendants wrongly assert the Court's affirmance of the Magistrate Judge's Order was on the basis that "it was not 'clearly erroneous' when the appropriate standard of review in this case would have been *de nova* [sic]." Defs.' mot. to stay at 4. Defendants well know that while the clearly erroneous standard was discussed at length in the March 8, 1996 Order, the Court unambiguously applied both standards of review called for in *Rule* 72(a), *Federal Rules of Civil Procedure*, and 28 U.S.C. § 636(b)(1)(A). *See, e.g., Better Gov't Bureau, Inc. v. McGraw*, No. 2:94–0952, slip op. at 3 (S.D.W.Va. Mar. 8, 1996) (stating "the Court cannot conclude the challenged ruling was clearly erroneous *or contrary to law*.") (emphasis added); *see also id.* at 4.

To the extent any doubt remains, however, the Court reaffirms its conclusion in the March 8 Order that the Magistrate Judge's ruling contravenes neither the deferential "clearly erroneous" standard of review applicable to factual questions nor the much less deferential "contrary to law" standard applicable to legal questions.

5. That assertion is belied somewhat by Ms. Allen's previous filings. The duties assigned to her by the Attorney General are noted in her motion to quash filed February 12, 1996. The duties lead more readily to the inference she was acting as an investigator solely and not as both attorney and investigator. For instance, the opening line of her memorandum in support of the motion to quash states she was appointed "for the purpose of investigating possible breach [sic] of confidentiality within the Office of the Attorney General and possible mismanagement of documents within the Office of the Attorney General." Simply put, legal counsel is not necessary to discharge such rudimentary investigatory goals, especially in an office which likely has a staff of investigators.

Further, in early articles announcing the appointment of Ms. Allen, which contained comments from McGraw, reporters stated Ms. Allen was hired as a "special investigator." Associated Press, *McGraw Hires Investigator*, Charleston Daily Mail, January 6, 1996; *see also* Associated Press, *West Virginia Investigating Missing File Case,* The Columbus Dispatch, January 6, 1996.

*Civil Liberties Union of Miss. v. Finch,* 638 F.2d 1336, 1343–44 (5th Cir.1981),

> [t]he purpose of enacting § 1983 was to ensure an independent federal forum for adjudication of alleged constitutional violations by state officials; and, as we noted in *Carr [v. Monroe Manufacturing Co.,* 431 F.2d 384 (5th Cir.1970) ],* there is a 'special danger' in permitting state governments to define the scope of their own privilege when the misconduct of their agents is alleged.

*Id.* at 1343–44. Where the analogous governmental privilege is claimed "in a § 1983 case [it] '[m]ust be so meritorious as to overcome the fundamental importance of a law meant to insure each citizen from unconstitutional state action.'" *Scouler v. Craig,* 116 F.R.D. 494, 496 (D.N.J.1987) (quoting *Wood v. Breier,* 54 F.R.D. 7, 13 (E.D.Wis.1972).

■ It is true that governmental officials can rely on the attorney-client privilege to protect confidential communications in certain circumstances. Nevertheless, the Court believes the general principles favoring disclosure have particular application to the instant case. What distinguishes this case from the routine § 1983 case involving the assertion of the attorney-client privilege is that BGB here has posited evidence from which a reasonable inference may be drawn that Defendants withheld critical discoverable evidence going to the heart of BGB's constitutional claims. This necessarily colors the Court's inquiry into whether Defendants now should be permitted to frustrate a fulsome inquiry into every matter relevant to the evidence that was withheld through the simple mechanism of hiring, after the fact, an attorney/investigator to examine generic claims of wrongdoings in the office.[6]

As noted in the Memorandum Opinion affirming the Magistrate Judge's Order relat-

ing to the attorney-client privilege, it is well-settled "the onus of demonstrating the applicability of [the] privilege falls upon the party asserting the privilege." *See, e.g., Cameron v. General Motors Corp.,* 158 F.R.D. 581, 584 (D.S.C.1994); *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982). This is a particularly exacting burden because, in part, "exceptions to the demand for every man's evidence are not lightly created *nor expansively construed,* for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) (emphasis added). Based on the two considerations discussed here, as well as those grounds considered by the Magistrate Judge, neither Ms. Allen nor the Defendants have met their burden of demonstrating entitlement to the privilege.[7]

■ It is well-settled that sanctions may be imposed for civil contempt " 'to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy.'" *In re General Motors Corp.,* 61 F.3d 256, 258 (4th Cir.1995) (quoting *Connolly v. J.T. Ventures,* 851 F.2d 930, 932 (7th Cir.1988)); *United States v. Darwin Constr. Co., Inc.,* 873 F.2d 750, 753–54 (4th Cir.1989). To impose sanctions for civil contempt, the Court need only "point to an order ... which 'set[s] forth in specific detail an unequivocal command' which a party has violated." *Id.* (quoting *Ferrell v. Pierce,* 785 F.2d 1372, 1378 (7th Cir.1986)). The burden is on the complainant to prove civil contempt by clear and convincing evidence, and willfulness is not an element of such. *Id.*

■ The remedy for civil contempt is within the Court's broad discretion. *Id.* (citing *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 193–94 (1949)). There is a range of permissible remedies available when an un-

---

6. BGB correctly notes its practically insurmountable task of obtaining the requested information from another source. The Court would note its review of the supplemental discovery depositions taken from McGraw and his employees are characterized by many failures of memory on the part of the deponents. Without commenting on the contents of the privileged material sought, a comparison of these same deponents' recall when interviewed by Ms. Allen, an individual

hired by McGraw, may prove critical for purposes of credibility and substantive proof of BGB's claims.

7. The Court's discussion of these two considerations is intended only to supplement the Magistrate Judge's March 5 Order and this Court's March 8 Order. Those two Orders remain in full force and effect.

cooperative non-party witness refuses to comply with a lawful order in reliance upon the attorney-client privilege. One option is imprisonment. As stated in *International Union, UMWA v. Bagwell,* —— U.S. ——, ——, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994), "[t]he paradigmatic coercive, civil contempt sanction … involves confining a contemnor indefinitely until he complies with an affirmative command…." Another option to coerce compliance is to impose a prospective per diem monetary penalty pending the contemnor's obedience to the order. *See, e.g., Petersen v. Douglas County Bank & Trust Co.,* 967 F.2d 1186 (8th Cir.1992) (affirming a district court's imposition of a $100 per day civil contempt penalty until a non-party relying on, *inter alia,* the attorney-client privilege complied with a discovery order). A final option is a flat fine reducible or avoidable by compliance. *Bagwell,* —— U.S. at ——, 114 S.Ct. at 2558. All of these remedies have one thing in common: the contemnor is offered an opportunity to purge and can avoid or reduce further coercive measures by compliance. *Id.*

When asked directly by the Court whether she would continue in her refusal to provide information ordered by this Court, Ms. Allen responded she would continue respectfully in her refusal. Based on the foregoing, the Court finds by clear and convincing evidence Ms. Allen refuses to comply with the well-defined and unequivocal commands of the Magistrate Judge's March 5 Order and this Court's subsequent affirmance of that Order. Accordingly, the Court finds and concludes Ms. Allen is in civil contempt of a lawful order.

The Court's next task is to craft an appropriate remedy. While it is true that "[c]ontempts such as failure to comply with document discovery … impede the court's ability to adjudicate the proceedings before it and thus touch upon the core justification for the contempt power[,]" the Court believes it would be unreasonable to incarcerate Ms. Allen at this juncture. *See Bagwell,* —— U.S. at ——, 114 S.Ct. at 2560. Rather, in an effort to impose a measured remedy to coerce compliance, Ms. Allen is **ORDERED** to pay over to the Clerk a coercive fine in the amount of two hundred fifty dollars ($250.00) per diem until she chooses to purge herself of contempt by compliance. The fine is prospective from entry of this Order. It is based on the earnings in the financial statement furnished by Ms. Allen at the request of the Court. The Court reserves the right to revisit and modify this remedy pending further developments.

After careful consideration, Defendants' motion to stay and Ms. Allen's informal stay request are **DENIED.**

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and Ms. Allen.