506 S.E.2d 799

STATE of West Virginia By and Through Darrell V. McGRAW, Jr., Attorney General, Plaintiff Below, Appellee,

v.

IMPERIAL MARKETING, et al., and Suarez Corporation Industries, Defendants Below,

Suarez Corporation Industries, Defendant Below, Appellant.

No. 24447.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 20, 1998.

Decided June 25, 1998.

Concurring Opinion of Justice Starcher Nov. 24, 1998.

James M. Cagle, Esq., Charleston, West Virginia, and C. Allen Foster, Esq., Eric C. Rowe, Esq., Steven D. Hedges, Esq., Greensboro, North Carolina, Attorneys for the Appellant.

C. Cooper Fulton, Esq., Assistant Attorney General, Charleston, West Virginia, Attorney for the Appellee.

Deborah M. Zuckerman, Esq., Washington, D.C., Attorney for Amicus Curiae American Association of Retired Persons.

Velma McClure, Esq., Morgantown, West Virginia, Attorney for Amicus Curiae North Central West Virginia Legal Aid Society.

PER CURIAM: [1]

This action is before this Court upon an appeal from the final order of the Circuit Court of Kanawha County, West Virginia, entered on April 25, 1997. Pursuant to that order, the circuit court granted summary judgment in favor of the appellee, the State

of West Virginia by and through Attorney General Darrell V. McGraw, and against the appellant, Suarez Corporation Industries. Concluding that various direct mail marketing solicitations sent by Suarez to West Virginia consumers violated the West Virginia Consumer Credit and Protection Act and, particularly, the Prizes and Gifts Act (contained within the Consumer Credit and Protection Act), the circuit court ordered (1) that Suarez be permanently enjoined from committing such violations, (2) that a $500,000 civil penalty be assessed in the event Suarez fails to abide by the injunction order and (3) that Suarez engage in a consumer refund program under the supervision of a special commissioner.

This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel.[2] It should be noted that an earlier, temporary injunction in this matter was upheld by this Court in *State By and Through Darrell V. McGraw, Jr., Attorney General, v. Imperial Marketing*, 196 W.Va. 346, 472 S.E.2d 792, *cert. denied*, 519 U.S. 966, 117 S.Ct. 391, 136 L.Ed.2d 307 (1996). Upon a careful review of the record and for the reasons expressed herein, we now affirm the permanent injunction. However, this Court reverses the final order with regard to the $500,000 civil penalty. Furthermore, we direct the circuit court to enter an order modifying the consumer refund program.

I.

PROCEDURAL HISTORY

Suarez Corporation Industries, located in Canton, Ohio, and its affiliated enterprises are in the business of selling consumer goods, such as simulated jewelry, through the use of direct mail marketing solicitations. Many solicitations were sent by Suarez to West Virginia residents prior to the institution of this action in 1994. The litigation surrounding the solicitations has been tem-

1. We point out that a per curiam opinion is not legal precedent. *See Lieving v. Hadley*, 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4. (1992).

2. An *amicus curiae* brief has been received by this Court from the American Association of Retired Persons. In addition, an *amicus curiae* brief has been received from the North Central West Virginia Legal Aid Society.

pestuous to say the least and has resulted in the amassing of hundreds of pages of pleadings, exhibits and transcripts. The limited record currently before this Court, as designated by the parties, is quite voluminous.

Specifically, the Attorney General instituted this action in the Circuit Court of Kanawha County against numerous defendants, including Suarez, alleging that the solicitation activities of the defendants constituted multiple transgressions of the West Virginia Consumer Credit and Protection Act and, particularly, the Prizes and Gifts Act contained therein. *W.Va.Code*, 46A–1–101 [1974], *et seq.*; *W.Va.Code*, 46A–6D–1 [1992], *et seq.*[3] As indicated in *Imperial Marketing, supra,* the mailings of Suarez were selected by the Attorney General as representative of the solicitations in question of all of the defendants. Ultimately, the litigation focused upon three specific marketing efforts of Suarez involving several thousand West Virginia consumers. The three solicitations, discussed below, included (1) the awarding to consumers of a 1–carat cubic zirconia diamond simulant and the related sale of a mounting for the stone, (2) the awarding of a cash prize to consumers and the related sale of a five-piece clutch purse ensemble and (3) the sale to consumers of a pair of crystal candle holders and a related bonus gift of a crystal heart-shaped dish.

On November 3, 1994, the circuit court awarded the Attorney General a temporary injunction restraining Suarez from violating the West Virginia Consumer Credit and Protection Act and the Prizes and Gifts Act.[4] In particular, the circuit court enjoined Suarez from, *inter alia,* soliciting consumers in West Virginia with an offer "which denominates an item as a prize, gift, award, premium, or similar term that implies the item is free whether stated or represented in any way, when the intended recipient is required to spend any sum of money to make meaningful use of it." In March 1996, this Court, in *Imperial Marketing,* upheld the temporary injunction.

The facts relating to the three solicitations in question are more specifically set forth in the *Imperial Marketing* opinion. With regard to the first solicitation, potential consumers were notified by Suarez that they had been awarded a free 1–carat cubic zirconia diamond simulant. The consumers were also told, however, that the stone had already been mounted in a necklace or ring which could be purchased for $19. If consumers desired the stone without purchasing the mounting, consumers were required to follow a convoluted claim procedure.[5] With regard

---

**3.** The action instituted by the Attorney General primarily sought injunctive relief against the defendants to restrain them from violating the Consumer Credit and Protection Act and the Prizes and Gifts Act. As *W.Va.Code*, 46A–7–108 [1974], provides: "The attorney general may bring a civil action to restrain a person from violating this chapter and for other appropriate relief." In addition, however, the Attorney General sought (1) civil penalties, (2) restitution on behalf of West Virginia consumers, (3) damages on behalf of West Virginia consumers, including punitive damages, (4) litigation costs and (5) attorney fees. Moreover, the Attorney General alleged: "The relevant time period for the causes of action alleged in this Complaint is from at least four years prior to the filing of this Complaint, and includes the present and future[.]" As *W.Va. Code*, 46A–7–111(2) [1974], for example, states in part: "No civil penalty pursuant to this subsection may be imposed for violations of this chapter occurring more than four years before the action is brought."

**4.** The authority of the Attorney General to seek temporary relief in the context of consumer protection is found in *W.Va.Code*, 46A–7–110 [1974], which states: "With respect to an action brought to enjoin violations of this chapter or unconscionable agreements or fraudulent or unconscionable conduct, the attorney general may apply to the court for appropriate temporary relief against a respondent, pending final determination of the proceedings."

**5.** Exhibit no. 3, submitted to the circuit court by Suarez, included the following instructions for claiming the diamond simulant without the $19 mounting:

If you are not ordering: to only claim your unmounted CZ Diamond Simulant prize from the Finalist Drawing and confirm your entry in the Winners and Final Drawing, affix the Security Insurance Shipping Label from the Winners Certification Claim Form over your name and address on the Official Prize Claim Notice. Write in "PRJ78A" below the label to insure the proper prize is shipped to you. Completely fill out the Official Prizewinners Release Form (Form 201) and sign it where indicated. (Grace period: an additional 23 days is allotted for receipt of prize claims and/or mounting selections.) Mail your completed Official Prizewinners Release in a plain white # 10 envel-

to the second solicitation, consumers were notified that they had been awarded a cash prize of "as much as $1,000." The consumers were also told, however, that the prize had been placed in a five-piece clutch purse ensemble which could be purchased for $12, plus $2 for special packaging and insurance. The solicitation indicated that "priority handling" would be afforded to consumers purchasing the purse ensemble. If consumers desired the cash prize without purchasing the purse ensemble, consumers were required to follow a claim procedure similar to that concerning the diamond simulant.[6] The third solicitation involved an offer to sell to consumers a pair of crystal candle holders for $19. As a bonus for the purchase, consumers were told that they would receive, as a gift, a crystal heart-shaped dish "worth over $15." Enclosed with the solicitation was a check for a nominal amount to be returned by the consumer to Suarez to help cover the cost of shipping and handling with regard to the dish. Problematic, as to this third solicitation, was the ambiguity surrounding both the value of the bonus gift and the nature of the enclosed check.

In considering those solicitations, and in affirming the circuit court's award of a temporary injunction, this Court, in *Imperial Marketing*, observed that the evidentiary standard for such relief in consumer protection cases is rather minimal. Focusing upon

the Prizes and Gifts Act, this Court, in *Imperial Marketing*, stated that, in seeking temporary relief, "the Attorney General need not prove the respondent has in fact violated the [Prizes and Gifts Act], but only needs to make a minimal evidentiary showing of good reason to believe that the essential elements of a violation of the Act are in view." 196 W.Va. at 352, 472 S.E.2d at 798. Suarez appealed this Court's decision in *Imperial Marketing* to the United States Supreme Court. That Court, however, denied certiorari in November 1996.

In the meantime, the Attorney General moved for summary judgment against Suarez. In the motion, the Attorney General indicated that a permanent injunction was warranted because the "undisputed conduct" of Suarez, as demonstrated by the solicitations, constituted violations of West Virginia law.[7] In response, Suarez alleged that, inasmuch as discovery in the action was "not complete," the motion of the Attorney General for summary judgment was premature. In addition, Suarez responded by filing a number of affidavits of its officers describing Suarez's business practices concerning its direct mail marketing efforts and denying that any violations of West Virginia law occurred. Moreover, Suarez asserted that various dissatisfied consumers brought to the attention of the circuit court by the Attorney General

---

ope (Do not use the enclosed return envelope.) to: Sweepstakes Claims Processing Center.... Improperly completed entries will be disqualified.

As this Court observed in *Imperial Marketing*, this cumbersome process was in contrast to the simplified method of purchasing a mounted stone. 196 W.Va. at 353 n. 11, 472 S.E.2d at 799 n. 11.

**6.** The record contains the following instructions for claiming the cash prize without purchasing the five-piece clutch purse ensemble:

If not ordering and to claim your cash prize only, cut out and affix the prize confirmation code located on the front [of] the Declaration of Cash Prize form to a 3–1/2 × 5–1/2 inch index card with your name, address and phone number and insert all into your own #10 white envelope. Failure to follow these instructions will cause forfeiture of your cash prize. Mail to Bulk–Sort Center ... to claim your cash prize. Do not use the enclosed envelope that is for ordering only, or your cash

prize and status as an eligible finalist will be waived. Since we will be required to remove your check from the purse if not ordering, we are required to give priority handling to those who accept the purse.

The record indicates that in almost no circumstances did the cash prize exceed a nominal amount.

**7.** As the parties suggest, the motion filed by the Attorney General may more accurately be described as a motion for partial summary judgment. Specifically, the final order of April 25, 1997, granting the motion concerned the award of a permanent injunction, the $500,000 civil penalty and the consumer refund program. The order did not resolve questions concerning consumer·damages (including punitive damages), litigation costs and attorney fees. *See* n. 3, *supra*. We observe, nevertheless, that the order of April 25, 1997, is appealable to this Court because it "approximates a final order in its nature and effect." Syl. pt. 2, *Durm v. Heck's, Inc.*, 184 W.Va. 562, 401 S.E.2d 908 (1991).

had simply "misinterpreted the plain meaning of promotions they received."

On December 13, 1996, the circuit court conducted a hearing upon the motion for summary judgment. Subsequently, on April 25, 1997, the circuit court entered the final order permanently enjoining Suarez from violating the West Virginia Consumer Credit and Protection Act and the Prizes and Gifts Act. In particular, the circuit court reaffirmed its previous findings concerning Suarez's solicitations (with regard to the temporary injunction) and concluded that "the only reasonable inference" that could be drawn from Suarez's practices was that deception constituted a material factor in consumer decisions to purchase the company's offers. As the final order stated, the evidence established that the solicitations "were actually misleading by virtue of material misrepresentations made, and that they exceed acceptable standards and practices allowing a certain degree of puffing in respect to sales transactions." [8]

As reflected in the final order, in addition to the award of a permanent injunction, the circuit court assessed a $500,000 civil penalty against Suarez payable in the event Suarez were to fail to abide by the injunction order. *See* n. 8, *supra*. Moreover, as more specifically described below, the circuit court directed Suarez to engage in a consumer refund program under the supervision of a special commissioner.

This appeal followed.

## II.

### STANDARDS OF REVIEW

In *Imperial Marketing*, the issue before this Court was whether the circuit court had justification to conclude that the Attorney General had made the "minimal evidentiary showing" necessary for a temporary injunction. As we indicated in that decision, a temporary injunction could be awarded upon "reasonable cause." 196 W.Va. at 352, 472 S.E.2d at 798. Since then, however, a permanent injunction has been awarded by the circuit court by way of summary judgment. Thus, in contrast to the "reasonable cause" standard, Rule 56 of the West Virginia Rules of Civil Procedure states that summary judgment is warranted where the record demon-

---

**8.** The final order stated that Suarez and its affiliated enterprises were permanently enjoined from the following:

A.  Soliciting consumers in West Virginia with an offer which denominates an item as a prize, gift, award, premium, or similar term that implies the item is free, whether stated or represented in any way, when the intended recipient is required to spend any sum of money to make meaningful use of it.

B.  Representing to consumers in West Virginia that the prize, gifts, award, premium, or similarly denominated item or any good or service offered to consumers has a value in excess of the fair market value.

C.  Representing to consumers that the consumer has specific odds or chances of winning a prize, contest, sweepstakes or similar promotion unless the specific odds or chance of winning has been numerically determined and can be substantiated prior to transmittal of the solicitation in accordance with the West Virginia Consumer Credit and Protection Act.

D.  Sending to potential customers in West Virginia solicitations which use language such as "You have won," "Declaration of Cash Prize," "You are entitled ...," "Certified Winner," and making representations to solicited persons in West Virginia of having won a prize, gift or other item of value, unless the solicited person is in fact given the prize, gift or item of value, without obligation, and unless

all of the conditions of the West Virginia Consumer Credit and Protection Act, *W.Va.Code*, 46A–6D–3 are met.

E.  Sending solicitations to persons in West Virginia which use official sounding language and seals such as: "Judges Seal," "Office of the Treasurer," "Claim Processing Division," that may lead a reasonable person to believe that he or she has won something of value; or sending solicitations that represent that the recipient has been specially selected, when in fact the solicitation is part of a mass mailing.

F.  The defendant shall not send material to persons in West Virginia which includes writing which simulates a check, or resembles a check or invoice, in violation of the West Virginia Consumer Credit and Protection Act.

G.  The defendant shall not solicit by sending to persons in West Virginia material referencing fake jewelry ratings or prize appraisals, bogus jewelers or agents who are holding prizes for the benefit of solicited customers in West Virginia.

H.  The defendant is enjoined from conducting any business in the State of West Virginia that is in violation of [the] West Virginia Consumer Credit and Protection Act. *W.Va.Code*, 46A–6D–3 *et seq.*

I.  The defendant is enjoined from conducting any business in the State of West Virginia that is in violation of [the] West Virginia Prizes and Gifts Act, *W.Va.Code*, 46A–6D–1, *et seq*[.]

strates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See generally,* Lugar & Silverstein, *West Virginia Rules of Civil Procedure,* p. 426–42 (Michie 1960).[9]

Our standards of review concerning summary judgment are well settled. As this Court stated in syllabus point 3 of *Aetna Casualty and Surety Co. v. Federal Insurance Co.,* 148 W.Va. 160, 133 S.E.2d 770 (1963): "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *See also,* syl. pt. 1, *Burdette v. Columbia Gas Transmission Corporation,* 198 W.Va. 356, 480 S.E.2d 565 (1996); syl. pt. 2, *Rose v. Oneida Coal Co.,* 195 W.Va. 726, 466 S.E.2d 794 (1995); *Payne v. Weston,* 195 W.Va. 502, 506, 466 S.E.2d 161, 165 (1995); syl. pt. 2, *Graham v. Graham,* 195 W.Va. 343, 465 S.E.2d 614 (1995). Moreover, we note that, upon appeal, the entry of a summary judgment is reviewed by this Court *de novo.* Syl. pt. 1, *Koffler v. City of Huntington,* 196 W.Va. 202, 469 S.E.2d 645 (1996); syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994).

In *Weaver v. Ritchie,* 197 W.Va. 690, 693, 478 S.E.2d 363, 366 (1996), this Court set forth the following *a priori* standard of review with regard to permanent injunctions: "In reviewing challenges to the findings and conclusions of the trial court, we apply a two-pronged deferential standard of review with the final order and ultimate disposition (granting of the permanent injunction) reviewed under an abuse of discretion standard, and the underlying factual findings under a clearly erroneous standard.". *See also,* syl. pt. 1, *G Corp, Inc. v. MackJo, Inc.,* 195 W.Va. 752, 466 S.E.2d 820 (1995). Here, as the final order indicates, the circuit court found as a matter of fact and law that the solicitations mailed by Suarez to West Virginia consumers violated the West Virginia Consumer Credit and Protection Act and the

Prizes and Gifts Act. We review that order pursuant to the above standards.

### III.

### THE PERMANENT INJUNCTION

The West Virginia Consumer Credit and Protection Act is found in chapter 46A of the West Virginia Code. That Act includes the Prizes and Gifts Act found in *W.Va.Code,* 46A–6D–1 [1992], *et seq.* The award of the permanent injunction in this action was based upon the conclusion of the circuit court that Suarez's solicitations violated the provisions of the Consumer Credit and Protection Act, generally, and the Prizes and Gifts Act, specifically. With regard to the latter Act, this Court observed in syllabus point 3 of *Imperial Marketing:* "The West Virginia Prizes and Gifts Act, *W.Va.Code* 46A–6D–1 to –10 (1992) was designed by the West Virginia Legislature to assist in protecting West Virginia citizens from being victimized by misleading and deceptive practices when a seller is attempting to market a product using a prize or gift as an inducement."

The principal sections of the Prizes and Gifts Act involved in this action are *W.Va. Code,* 46A–6D–3 [1992], concerning the representation of having won a prize or gift, and *W.Va.Code,* 46A–6D–4 [1992], concerning the representation of eligibility to receive a prize or gift. As *W.Va.Code,* 46A–6D–3(a) [1992], concerning having won a prize or gift, provides in part:

[A] person may not, in connection with the sale or lease or solicitation for the sale or lease of goods, property or service, represent that another person has won anything of value or is the winner of a contest, unless all of the following conditions are met:

(1) The recipient of the prize, gift or item of value is given the prize, gift or item of value without obligation; and

(2) The prize, gift or item of value is delivered to the recipient at no expense to him or her, within ten days of the representation.

---

9. It should be noted that, where appropriate, injunctive relief may be awarded by summary judgment. *Arch Mineral Corporation v. Babbitt,* 104 F.3d 660 (4th Cir.1997); *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason University,* 993 F.2d 386 (4th Cir.1993).

Moreover, as *W.Va.Code,* 46A–6D–4(a) [1992], concerning eligibility to receive a prize or gift, provides:

A person may not represent that another person is eligible or has a chance to win or to receive a prize, gift or item of value without clearly and conspicuously disclosing on whose behalf the contest or promotion is conducted, as well as all material conditions which a participant must satisfy. In an oral solicitation all material conditions shall be disclosed prior to requesting the consumer to enter into the sale or lease. Additionally, in any written material covered by this section, each of the following shall be clearly and prominently disclosed:

(1) Immediately adjacent to the first identification of the prize, gift or item of value to which it relates; or

(2) In a separate section entitled "Consumer Disclosure" which title shall be printed in no less than ten-point bold-face type and which section shall contain only a description of the prize, gift or item of value and the disclosures outlined in paragraphs (i), (ii) and (iii) of this subdivision:

(i) The true retail value of each item or prize;

(ii) The actual number of each item, gift or prize to be awarded; and

(iii) The odds of receiving each item, gift or prize.

As indicated above, the permanent injunction herein was awarded by way of summary judgment. Suarez contends that, because discovery in this action was incomplete, the circuit court acted precipitously in concluding that the solicitations violated the Prizes and Gifts Act. Thus, Suarez asserts that the circuit court committed error in not granting its request, made pursuant to Rule 56(f) of the West Virginia Rules of Civil Procedure, for further discovery.[10] Moreover, Suarez asserts that the circuit court committed error in not concluding that the evidence of various officers of Suarez and consumers created a question of fact concerning whether the solicitations violated West Virginia law. Thus, according to Suarez, the circuit court committed error in granting the summary judgment. As discussed below, however, the assertions of Suarez in that regard are without merit.

 As to Rule 56(f), this Court, in syllabus point 1 of *Powderidge Unit Owners Association v. Highland Properties, Ltd.,* 196 W.Va. 692, 474 S.E.2d 872 (1996), held as follows:

An opponent of a summary judgment motion requesting a continuance for further discovery need not follow the exact letter of Rule 56(f) of the West Virginia Rules of Civil Procedure in order to obtain it. When a departure from the rule occurs, it should be made in written form and in a timely manner. The statement must be made, if not by affidavit, in some authoritative manner by the party under penalty of perjury or by written representations of counsel. At a minimum, the party making an informal Rule 56(f) motion must satisfy four requirements. It should (1) articulate some plausible basis for the party's belief that specified "discoverable" material facts likely exist which have not yet become accessible to the party; (2) demonstrate some realistic prospect that the material facts can be obtained within a reasonable additional time period; (3) *demonstrate that the material facts will, if obtained, suffice to engender an*

---

**10.** Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion [for summary judgment] that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

As syllabus point 3 of *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995), states:

If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the non-moving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

*issue both genuine and material;* and (4) demonstrate good cause for failure to have conducted the discovery earlier.

(emphasis added)

Here, with regard to discovery, the record indicates that, prior to the entry of summary judgment, the Attorney General permitted Suarez to extensively examine and copy the State's files concerning the solicitations. Moreover, the individuals Suarez asserts it should have been allowed to depose prior to the entry of that judgment consisted largely of West Virginia consumers who testified and were cross-examined about the solicitations during the temporary injunction stage of the litigation. Thus, as the State asserts concerning those consumers, "the substance of their potential testimony [was] already known" by Suarez before the summary judgment was entered.[11]

In addition, the affidavits of corporate officers submitted by Suarez in response to the motion for summary judgment indicated that, pursuant to Suarez's marketing strategy, the solicitations sent to West Virginia consumers offering a free gift always provided the following alternatives: "[E]ither the recipient may request the free gift, without obligation, or, alternatively, the recipient may pay a fee for an enhanced product." In that regard, we note that the affidavits simply emphasized the language actually employed in the solicitations, rather than extrinsic evidence.

More importantly, the discovery issue and the affidavits filed by Suarez notwithstanding, this Court is of the opinion, as we suggested in *Imperial Marketing*, that, in the circumstances of this action, the question of whether Suarez violated this State's consumer protection law, and, particularly, the provisions of the Prizes and Gifts Act set forth above, depends upon the language of the solicitations themselves and not upon extrinsic evidence. Here, the circuit court properly determined that violations occurred, and the circuit court acted within its discretion in awarding the permanent injunction.

Although ostensibly requiring no purchase or obligation, the solicitations under consideration, while suggesting a certain mutability on the surface, possess a persistent deceptive quality beneath. As stated above, with regard to the first solicitation, West Virginia consumers were notified by Suarez that they had been awarded a free 1–carat cubic zirconia diamond simulant. The consumers were also told, however, that the stone had already been mounted in a necklace or ring which could be purchased for $19. If consumers desired the stone without purchasing the mounting, consumers were required to follow a convoluted claim procedure. *See* n. 5, *supra.* Thus, the violation of *W.Va.Code,* 46A–6D–3(a) [1992], i.e., that the recipient of a prize or gift must be given the prize or gift "without obligation" and that it be delivered to the recipient "at no expense," is evidenced by the following language of the solicitation:

> [T]his office can only award the 1–carat Lindenwold CZ Diamond, not the mounting. If you do not select a mounting, it may take up to 60 days to ship your prize. So, in order to patch up this confusion we are able to make this special arrangement for you: (this offer cannot be transferred):
>
> 1. First you need to look through the enclosed Showroom Selections and choose the beautiful mounting you like best.
>
> 2. Since the 1–carat Lindenwold CZ Diamond is already mounted it will cost the jeweler too much to remove the CZ Jewel. Therefore, they have agreed to allow you to select any showroom mounting and ship it to you. All they ask is that you cover the standard $19 Transfer Deposit.

Similarly, with regard to the second solicitation, consumers were notified that they had been awarded a cash prize of "as much as $1,000." The consumers were also told, however, that the prize had been placed in a five-piece clutch purse ensemble which could be purchased for $12, plus $2 for special packaging and insurance. The solicitation indicated that "priority handling" would be afforded to

---

11. The individuals sought to be deposed by Suarez included, *inter alia,* Janice Estep, Minnie Johnson, Woodrow Nieman, William Knighton and Eleanor Jones. Those individuals were West Virginia consumers who testified at various hearings before the circuit court prior to the final award of temporary injunctive relief.

consumers purchasing the purse ensemble. If consumers desired the cash prize without purchasing the purse ensemble, consumers were required to follow a claim procedure similar to that concerning the diamond simulant. *See* n. 6, *supra.* Thus, the violation of *W.Va.Code,* 46A–6D–3(a) [1992], i.e., that the recipient of a prize or gift must be given the prize or gift "without obligation" and that it be delivered to the recipient "at no expense," is evidenced by the following language of the clutch purse solicitation:

> As a guaranteed cash prize winner, the 5 piece Givone Clutch Purse Ensemble holding your check will be transferred to you when you cover the sponsor's special publicity discount fee of just $12, plus $2 for special packaging and insurance. * * * Remember, since the checks will already be in the purses, we are required by the sponsor's rules to give priority handling to those who are able to accept entitlement to their purse by submitting the minimum fee.

■ Finally, as stated above, the third solicitation involved an offer to sell to consumers a pair of crystal candle holders for $19. As a bonus for the purchase, consumers were told that they would receive, as a gift, a crystal heart-shaped dish "worth over $15." Enclosed with the solicitation was a check for a nominal amount to be returned by the consumer to Suarez to help cover the cost of shipping and handling with regard to the dish. The consumer's eligibility to receive the heart-shaped dish as a bonus gift therefore brings into play the above provisions of *W.Va.Code,* 46A–6D–4(a) [1992], which require disclosure of "[t]he true retail value of each item or prize[.]" The statement in the solicitation that the dish was "worth over $15" did not comply with that statutory admonition.[12] Moreover, whether the enclosed check for the nominal amount was a negotiable instrument or simply a simulated check was rendered ambiguous by the fact that the check was attached to an "Entitlement Form" which stated: "Do not detach [the check]—Return with order for free crystal heart box." *See, W.Va.Code,* 46A–6D–6(a) [1992], which provides that, in connection with a consumer transaction, no person may issue any writing which simulates or resembles a check, unless the writing clearly and conspicuously discloses "its true value and purpose."

■ During the course of this litigation, both the Attorney General and Suarez elicited the testimony of various consumers before the circuit court concerning the solicitations. Whereas the witnesses for the State indicated that the true import of the solicitations was difficult to grasp and that they had experienced a certain degree of bureaucratic hubris in their communications with Suarez, the witnesses called by Suarez suggested that the solicitations were quite clear and that their dealings with Suarez were satisfactory. The futility of that type of extrinsic evidence in cases of this nature, however, is evidenced by the fact that, during a one year period only, more than 17,000 West Virginia consumers received solicitations from Suarez or its affiliated enterprises. Rather, under the circumstances of this action, and in view of the solicitations described above, this Court is of the opinion that the testimony of the consumers failed to establish a genuine issue of material fact within the meaning of Rule 56. As the final order of April 25, 1997, stated: "It is irrelevant, however, that there are some West Virginia consumers who are satisfied with their merchandise. The issue is: whether defendant, in its solicitation efforts in West Virginia ... engaged in conduct which is calculated to or likely to, deceive and misrepresent the offer, and thereby violate [West Virginia law]." Indeed, in awarding the permanent injunction, the circuit court concluded that "the only reasonable inference" that could be drawn from Suarez's practices was that deception constituted a material factor in consumer decisions to purchase the company's offers.

12. Manifestly, the required disclosure of *W.Va. Code,* 46A–6D–4(a) [1992], constitutes a recognition by the West Virginia Legislature that consumers may be influenced in their purchase of the underlying product by the value of the bonus gift. As this Court observed in *Imperial Market-ing* with regard to the heart-shaped dish, consumers were not provided "a clear and meaningful representation as to the true retail value of the bonus." 196 W.Va. at 356 n. 29, 472 S.E.2d at 802 n. 29.

As the opinion in *Imperial Marketing* observes: "It is clear from this record that [Suarez's] solicitations induce a consumer to purchase a product not necessarily with direct misrepresentations about a product, but with other misleading and deceptive practices which affect the consumer's decision to buy." 196 W.Va. at 357, 472 S.E.2d at 803. Thus, as syllabus point 7 of *Imperial Marketing* holds:

> Under the West Virginia Prizes and Gifts Act, *W.Va.Code,* 46A–6D–1 to –10 (1992), once the circuit court makes a finding that deceptive practices are used to affect a consumer's decision to purchase a product, then the circuit court is authorized, within the bounds of reason, to infer that the deception will constitute a material factor in a consumer's decision to purchase the product.

■ Accordingly, upon all of the above, this Court holds that pursuant to the West Virginia Consumer Credit and Protection Act, *W.Va.Code,* 46A–1–101 [1974], *et seq.,* and the Prizes and Gifts Act included therein, *W.Va.Code,* 46A–6D–1 [1992], *et seq.,* the

validity of direct mail marketing solicitations to West Virginia consumers must be resolved upon a case by case basis; however, where the language of such a solicitation is, on its face, misleading, deceptive and calculated to unfairly induce consumers to purchase a product, then such solicitation is in contravention of those statutes as a matter of law, and a circuit court is authorized to determine, without resort to extrinsic evidence, that the West Virginia Consumer Credit and Protection Act and the Prizes and Gifts Act have been violated, and a circuit court is further authorized to award injunctive relief in order to restrain such misconduct.

■ Here, the nature of the solicitations in question and the determination by the circuit court that deception was "the only reasonable inference" arising therefrom lead this Court to the inexorable conclusion that summary judgment was proper.[13] *See Imperial Marketing,* 196 W.Va. at 358, 472 S.E.2d at 804, citing *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), to the effect that "where

---

**13.** Suarez asserts that, pursuant to the provisions of *W.Va.Code,* 46A–6D–4(d) [1992], and *W.Va. Code,* 46A–6D–10 [1992], it is exempt from the Prizes and Gifts Act. It should be noted, however, that by their express terms, neither of those provisions applies to *W.Va.Code,* 46A–6D–3 [1992], which requires that the recipient of a prize or gift must be given the prize or gift "without obligation" and that it be delivered to the recipient "at no expense." As the exemption found in *W.Va.Code,* 46A–6D–4(d) [1992], states:

> The provisions of this section do not apply where to be eligible:
> (1) Participants are asked only to complete and mail, or deposit at a local retail commercial establishment, an entry blank obtainable locally or by mail, or to call in their entry toll free by telephoning or other free or local calling option; or
> (2) Participants are never required to listen to a sales presentation and never requested or required to pay any sum of money for any merchandise, service or item of value.

As stated, that exemption does not apply to *W.Va.Code,* 46A–6D–3 [1992], and would, therefore, not affect the discussion herein concerning the cubic zirconia diamond simulant or the clutch purse ensemble. Moreover, the heart-shaped dish, although implicating *W.Va.Code,* 46A–6D–4 [1992], simply concerns the disclosure of "the true retail value" thereof, which was found lacking by the circuit court. The assertion that *W.Va.Code,* 46A–6D–4(d) [1992], exempts

Suarez from the Prizes and Gifts Act is, under the circumstances of this action, unconvincing.

Furthermore, the exemption found in *W.Va. Code,* 46A–6D–10 [1992], is clearly limited in its application. That section provides:

> The provisions of sections four through seven of this article do not apply to the sale or purchase, or solicitation or representation in connection therewith, of goods from a catalog or of books, recordings, videocassettes, periodicals and similar goods through a membership group or club which is regulated by the federal trade commission trade regulation rule concerning use of negative option plans by sellers in commerce or through a contractual plan or arrangement such as a continuity plan, subscription arrangement or a single sale or purchase series arrangement under which the seller ships goods to a consumer who has consented in advance to receive such goods and the recipient of such goods is given the opportunity, after examination of the goods, to receive a full refund of charges for the goods, or unused portion thereof, upon return of the goods, or unused portion thereof, undamaged.

As reflected in the final order, the circuit court concluded that *W.Va.Code,* 46A–6D–10 [1992], did not exempt Suarez in this action. As in the case of the previous exemption, the provisions of *W.Va.Code,* 46A–6D–10 [1992], to not apply to *W.Va.Code,* 46A–6D–3 [1992]. In any event, the *W.Va.Code,* 46A–6D–10 [1992], exemption is not relevant to this action.

the possibility of deception is self-evident, extrinsic evidence is not necessary for a finding that materials are misleading." *See also, Double Eagle Lubricants v. Federal Trade Commission*, 360 F.2d 268, 270 (10th Cir. 1965), indicating that evidence of actual deception is not necessary "where the exhibits themselves sufficiently demonstrate their capacity to deceive."

Therefore, upon all of the above, the circuit court's award of the permanent injunction was "protected by the parameters of sound discretion." *Parker v. Knowlton Construction Company*, 158 W.Va. 314, 329, 210 S.E.2d 918, 927 (1975).[14]

## IV.

### REMAINING ISSUES

As indicated above, the final order of April 25, 1997, enumerated a number of findings and conclusions with regard to the award of the permanent injunction. Those findings and conclusions were certainly sufficient for the circuit court to have based its determination upon that Suarez engaged in a course of repeated and willful violations pursuant to *W.Va.Code*, 46A–7–111(2) [1974]. However, the statute, upon such findings, provides for a civil penalty of no more than $5,000.[15]

The reference to the penalty in the final order stated in its entirety: "A civil penalty of $500,000 pursuant to *W.Va.Code*, 46A–1–101, *et seq.* and *W.Va.Code*, 46A–6D–1, *et seq.* shall be imposed, and shall be suspended upon compliance with [the] terms of paragraphs A through I." Paragraphs A through I of the final order listed the actions from which Suarez and its affiliated enterprises were permanently enjoined. *See* n. 8, *supra*. Although, as stated, payment of the penalty was contingent upon Suarez's failure to abide by the permanent injunction order, nothing in the final order indicated by what manner the $500,000 amount was determined.

Consequently, the silence of the final order (and indeed of the record before us) with respect to how the amount of $500,000 was determined, particularly in light of the statutory limitation of $5,000, precludes any meaningful review of the penalty by this Court. In other words, the absence of any reasoning with respect to how the Court arrived at the $500,000 amount necessarily renders that amount arbitrary. Syl. pt. 4, *Poole v. Berkeley County Planning Commission*, 200 W.Va. 74, 488 S.E.2d 349 (1997); syl. pt. 2, *Farm Family Mutual Insurance Company v. Bobo*, 199 W.Va. 598, 486 S.E.2d 582 (1997); syl. pt. 3, *Fayette County National Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997). Therefore, the $500,000 civil penalty against Suarez must be set aside.

The Attorney General argues persuasively that a maximum penalty of $5,000 in an action such as this one serves as very little deterrent to repeated violations of the West Virginia Consumer Credit and Protection Act

---

**14.** As stated in the brief filed by Suarez: "The West Virginia Prizes and Gifts Act does not prohibit the sale of products through direct mail marketing and promotion. Nor does it prohibit the use of sweepstakes or contests as part of the promotion of a product." That statement is consistent with this Court's opinion in *Imperial Marketing* which acknowledges: "There is nothing within the four corners of the temporary injunction which prevents [Suarez] from engaging in mail solicitation in a manner which does not violate the Act." 196 W.Va. at 364, 472 S.E.2d at 810.

Nevertheless, although this opinion focuses solely upon three solicitations, i.e., those relating to the cubic zirconia diamond simulant, the clutch purse ensemble and the crystal candle holders, a number of additional solicitations mailed by Suarez to West Virginia consumers were brought into question before the circuit court. Those additional solicitations, upon the limited record before this Court, remain somewhat undefined, and this Court is not in a position to "expiscate or 'fish out' from the record the details and circumstances" surrounding those solicitations. *See, Maxey v. Maxey*, 195 W.Va. 158, 159, 464 S.E.2d 800, 801 (1995). However, to the extent that those solicitations are substantially similar to the three solicitations discussed herein, Suarez engages in them at its peril.

**15.** *W.Va.Code*, 46A–7–111(2) [1974], states in part:

The attorney general may bring a civil action against a creditor or other person to recover a civil penalty for willfully violating this chapter, and if the court finds that the defendant has engaged in a course of repeated and willful violations of this chapter, it may assess a civil penalty of no more than five thousand dollars.

and the Prizes and Gifts Act. While this Court must agree with that contention, we recognize that the amount of the civil penalty under *W.Va.Code*, 46A–7–111(2) [1974] is more appropriately a matter to be addressed by the Legislature. As indicated above, under the circumstances of this action, we simply set the penalty aside.[16]

Finally, the final order entered by the circuit court directed Suarez to engage in a consumer refund program under the supervision of a special commissioner. As the final order stated:

> The Suarez Corporation shall offer refunds to consumers identified in the list within 30 days of the signing of this decree which shall inform consumers of the availability of the refunds and shall identify the amount spent by the consumer and shall identify the product purchased by the consumer.
>
> a.  The defendant shall not condition the refund on a return of the product.
>
> b.  Defendant shall send the consumer a check for the full amount of the refund within 30 days of receipt of the request for the refund.
>
> Defendants shall bear all costs of the program herein, including mailing, printing and administration.

This Court shall appoint a proper and discreet attorney at law to serve as Special Commissioner to certify the entire process.

In September 1997, the special commissioner filed a report with the circuit court indicating that he had met with counsel for the parties and that certain notices to consumers concerning refunds and time-frames for the payment thereof were recommended. A review of the report remains pending in the circuit court.

According to Suarez, the refund program is unfair because it allows West Virginia consumers to request and obtain refunds without having to return the product purchased. In that regard, Suarez relies upon the provisions of *W.Va.Code*, 46A–7–111 [1974], which authorizes refunds to consumers for "excess charges." The Attorney General, on the other hand, relies upon *W.Va. Code*, 46A–7–108 [1974], which states: "The attorney general may bring a civil action to restrain a person from violating this chapter *and for other appropriate relief.*" (emphasis added)

■ Upon a careful review of this matter, this Court is of the opinion that the assertion of unfairness by Suarez is without merit. Rather, we find compelling the reasoning of the Attorney General that the use of the phrase "other appropriate relief" in *W.Va. Code*, 46A–7–108 [1974], "indicates that the

---

**16.** As indicated above, the penalty attempted to be imposed herein was suspended, pending compliance by Suarez with the terms of the permanent injunction. Thus, under the terms of the final order, Suarez would have to pay nothing so long as it obeyed the permanent injunction. The amount imposed, therefore, is somewhat in the nature of a "performance bond," rather than a penalty in its strictest sense. As the brief filed by the Attorney General stated: "[The penalty] is more akin to a requirement that [Suarez] post a performance bond." *See, by analogy, Campbell v. Point Pleasant & Ohio River R.R.*, 23 W.Va. 448 (1884); 10A M.J. *Injunctions* § 109 [1990]; 43A C.J.S. *Injunctions* § 238(c) [1978], indicating that courts may substitute a defendant's bond of indemnity for an injunction. Here, however, the performance bond issue is not before this Court and is more appropriately subject to consideration by the circuit court upon the remand of this action.

In addition, we are not unmindful of the decisions of this Court concerning prospective monetary sanctions in *Vincent v. Preiser*, 175 W.Va.

797, 338 S.E.2d 398 (1985), and *State ex rel. UMWA International Union v. Maynard*, 176 W.Va. 131, 342 S.E.2d 96 (1985). Those cases, however, are not dispositive of the penalty issue herein concerning the West Virginia Consumer Credit and Protection Act and the Prizes and Gifts Act because, under the circumstances of this action, (1) a specific penalty statute relating to consumer protection, i.e., *W.Va.Code*, 46A–7–111(2) [1974], is relied upon, and (2) that statute expressly states that the penalty set forth therein is civil, whereas in *Vincent* and in *UMWA International Union*, this Court considered there to be criminal or quasi-criminal aspects of the sanctions. *See, State ex rel. Robinson v. Michael*, 166 W.Va. 660, 276 S.E.2d 812 (1981). *See also, State Farm Mutual Automobile Insurance Company v. Stephens*, 188 W.Va. 622, 425 S.E.2d 577 (1992), stating that "courts have recognized that the imposition of a *per diem* fine is an appropriate sanction for civil contempt of a discovery order when the purpose of the monetary sanction is remedial rather than punitive." 188 W.Va. at 631, 425 S.E.2d at 586.

legislature meant the full array of equitable relief to be available in suits brought by the Attorney General." That principle is particularly persuasive where, as demonstrated by the record in this action, the value of the products remains ambiguous. The assertion of Suarez is further deprived of significance by the distinction that *W.Va.Code*, 46A–7–111(1) [1974], is primarily concerned with the excessive charging of consumers for products, whereas the Prizes and Gifts Act, *W.Va. Code*, 46A–6D–1 [1992], *et seq*, so central to this action, concerns the protection of consumers from "misleading and deceptive practices when a seller is attempting to market a product using a prize or gift as an inducement." Syl. pt. 3, *Imperial Marketing, supra.*

On a final note, the refund program set forth in the order of April 25, 1997, states that Suarez shall offer refunds to consumers "identified in the list." Presumably, as indicated by the special commissioner, the list referred to is the list generated pursuant to the September 1, 1994, order of the circuit court. The final order, however, is unclear in that respect and, upon remand of this action, should be modified to more particularly identify those West Virginia consumers entitled to request a refund.

Upon all of the above, the final order of the Circuit Court of Kanawha County, entered on April 25, 1997, is affirmed with regard to the award of the permanent injunction. The refund program set forth in the final order is also affirmed, subject to the modification described above. The final order is reversed, however, as to the $500,000 civil penalty, and the penalty is hereby set aside. Accordingly, this action is remanded to the circuit court for further proceedings.

Affirmed, in part, reversed, in part, and remanded with directions.

McCUSKEY, J., deeming himself disqualified, did not participate in the decision in this case.

FOX, Judge, sitting by temporary assignment.

STARCHER, Justice, concurring:

(Filed Nov. 24, 1998)

When the Attorney General's Office filed this lawsuit in September 1994, it compiled a list of 17,563 West Virginia consumers who were swayed by Suarez Corporation Industries' ("Suarez") fraudulent solicitations to spend $975,389.02 on trinkets. Now, 4 years later, the Attorney General is still embroiled in tedious litigation to compel Suarez to refund that money to those consumers.

The majority opinion cleanly decides the legal issues raised by Suarez in its continuing attempts to avoid responsibility for the misleading solicitations. I concur with the majority's reasoning, and write to expand upon the extensive factual and legal reasons that support the Court's opinion.

I.

*A Permanent Injunction and Restitution were Warranted*

The main issue raised by Suarez on appeal is that the circuit court improperly granted summary judgment, and basically improperly stopped Suarez from using misleading solicitations and required Suarez to repay West Virginia consumers. Suarez argues two grounds: first, it should have been allowed to conduct discovery far in excess of that already conducted (the record in this case currently fills two banker's boxes); and second, it should have been allowed to present testimony through witnesses who would say they were not mislead by any Suarez solicitations, and testimony through loyal Suarez employees who would say no one intended to mislead anyone. Suarez basically argues that if a consumer who received a Suarez solicitation was misled, it was the consumer's fault.

These arguments carry no weight. First, no additional discovery was needed in this case. Each side was given ample opportunity to examine the evidence held by their opponent. Testimony was taken from numerous witnesses, and piles of documents were exchanged and examined. Suarez has not directed us to any undiscovered area where evidence exists suggesting that each of the 17,563 West Virginia consumers did not receive one or more of the dozens of solicita-

tions in the record. Further, Suarez has failed to direct us to any unexamined evidence suggesting that the misleading nature of the dozens of different solicitations in the record was the result of some repeatedly-occurring printing error or other factor.[1] The Attorney General's office made all of its evidence available for Suarez to inspect; accordingly, no additional discovery was necessary.

Second, the Attorney General overwhelmingly proved that Suarez repeatedly used deceptive practices to affect consumers' decisions to buy his products, through the use of the many misleading solicitations mailed to West Virginia consumers. Summary judgment was proper because the Attorney General conclusively proved his case. Suarez never introduced evidence to dispute the fact that many of the 17,563 consumers were deceived by one or more of the solicitations. Instead, Suarez's defense was that because *some* consumers were not deceived and merely wanted to buy its products, the company should be allowed to put on evidence extrinsic to the printed solicitations through those satisfied consumers. Those consumers were expected to testify that they were able to read through the fine print in the solicitations, and Suarez contends it would also offer the testimony of employees who would say there was no intent by Suarez to mislead anyone. Basically, Suarez's argument appears to be that the trial court should have to sort through the 17,563 consumers one at a time to determine who was deceived and who was not.

As demonstrated in the majority opinion (as well as this Court's opinion in *State by and through McGraw v. Imperial Marketing,* 196 W.Va. 346, 472 S.E.2d 792 (1996)), the Court closely examined three of Suarez's solicitations to demonstrate how the solicitations violated the Consumer Protection Act and Prizes and Gifts Act. I write to make clear that the permanent injunction against Suarez and the award of relief to West Virginia consumers is warranted, not only because of these three solicitations, but also because of the dozens of other solicitations entered into the record by the Attorney General. Seventeen Suarez solicitations were attached to one pleading alone.

Simply put, each of these solicitations contains language clearly violating the Consumer Credit and Protection Act and the Prizes and Gifts Act. I was unable to count the number of times the phrases "Official Prize Claim Notice," "Winners Certification Claim Form," or "Cash Prize Release Document" were used. Each solicitation began by telling the consumer that he or she was a winner—but buried in the fine print, or on another letter in the envelope, was the hint they really weren't a big winner after all. Therefore, many of the solicitations violate *W. Va.Code,* 46A–6D–3 [1992], which prohibits persons from making representations that someone has won a prize unless that prize is awarded to the consumer without obligation and delivered within 10 days of the representation.

Another problem with the solicitations in the record is that, while every solicitation carried the disclaimer "no purchase necessary," every solicitation also carried the suggestion the recipient was more likely to be a winner or would get their prize faster if they

---

1. The record suggests that Suarez mailed solicitations or letters under such names as National Publicity Sweepstakes; National Publicity Services; Board of Compensation and Property; Case, Waterman & Associates; Lindenwold Fine Jewelers; Lady Lindenwold; Devoorst (International Purveyors of Fine Diamonds and Gem Stones); Earnst & Alexander Holding Associates; Office of the Treasurer; Payables Desk, Department of Sweepstakes Administration; Redemption Center, Office of Cash Distribution; International Home Shopping; North American Travel Bureau; The Heard Academy; and U.S. Commemorative Fine Art Gallery. Suarez operates other subsidiaries not involved in this case: Unimax Computer Manufacturing; CompuClub Software; Pro Tour Sports Equipment Manufacturing; International TeleCommunications; The Hanford Press; Media Services; Campaign Services; and Associated Brokers Realty.

The Prizes and Gifts Act states that a person may not represent that another person is eligible to win a prize "without clearly and conspicuously disclosing on whose behalf the contest or promotion is conducted...." *W.Va.Code,* 46A–6D–4(a) [1992]. While the names used in the Suarez solicitations may have been registered with the Ohio Secretary of State as fictitious names or trade names, that is *not* a clear and conspicuous disclosure to a West Virginia consumer that Suarez was behind the solicitations.

first bought some merchandise. *W.Va.Code*, 46A–6D–4(c) [1992] prohibits persons from making representations that as a condition of receiving a prize, the consumer must pay money or purchase, lease or rent goods or services.

Another example is a solicitation that tells the consumer that they have won a "4–Door Chevrolet· Caprice, Model Year 1995 if your Vehicle Award Claim is confirmed as a winning claim"—and attached is a note entitling the consumer to three "Bonus Awards" "worth up to $300." [2] As discussed in the majority opinion, the use of the vague language "worth up to" is a clear violation of the Consumer Credit and Protection Act. *See W.Va.Code*, 46A–6D–4(a)(2)(i) [1992] (written sweepstakes materials must contain "[t]he true retail value of each item or prize").

The record also contains a solicitation from the "tie-breaker supervisor" of the "Payables Desk, Department of Sweepstakes Administration" which tells the recipient that he or she is "tied" with other individuals to win a cash prize—without telling the reader the odds of winning, that is, how many other people the reader was "tied" with. This solicitation was likely drafted by someone who full-well knew the language was misleading, but thought it could later be argued that it "technically" was within the bounds of every consumer protection statute in the country. On the contrary, because the solicitation is misleading on its face, and because it fails to state the odds the consumer has of winning the sweepstakes, it violates West Virginia's consumer protection laws. *See W.Va.Code*, 46A–6D–4(a)(2)(iii) [1992] (written sweepstakes materials must contain "[t]he odds of receiving each item, gift or prize").

As the majority opinion makes clear, whether Suarez or any other sweepstakes operator violated this State's consumer protection law by mailing a consumer a solicitation primarily depends upon the language of the solicitation itself and not upon extrinsic evidence. If the language of a solicitation is, on its face, misleading, deceptive and, to the eye of a reasonable beholder, calculated to unfairly induce customers to purchase a product, then the solicitation violates the Consumer Credit and Protection Act, *W.Va. Code*, 46A–1–101 to –8–102, and the Prizes and Gifts Act, *W.Va.Code*, 46A–6D–1 to 10. Because the many solicitations in the record are patently deceptive, misleading, and obviously calculated to unfairly induce West Virginia consumers to buy cheap merchandise at inflated prices, the circuit court was correct in granting summary judgment to the Attorney General, awarding injunctive relief against Suarez, and requiring Suarez to pay back every single consumer who lost money as a result of receiving one of Suarez's solicitations.

## II.

### *The Civil Penalty*

*W.Va.Code*, 46A–7–111(2) [1974] [3] authorizes the Attorney General to bring a civil action against any person for each and every willful violation by that person of the Consumer Credit and Protection Act. If the circuit court finds the person has "engaged in a course of repeated and willful violations" of the Act, the court can assess a penalty of up to $5,000.00. The meaning of this statute is clear: for every individual violation of the Act, the Attorney General can bring a lawsuit and collect a civil penalty up to $5,000.00.

In this case, the Attorney General compiled a list of at least 17,563 violations [4] of the

---

**2.** The three awards are: a 3–carat "pear-shaped Faux Diamond" (with a note pointing out that "mined Diamonds usually have imperfections ... your Faux Diamond is internally perfect."); an electroplated gold ring on which to mount the fake diamond; and 40 "FREE Accent Faux Diamonds" to surround the pear-shaped imitation diamond.

**3.** *W.Va.Code*, 46A–7–111(2) [1974] states:

The attorney general may bring a civil action against a creditor or other person to recover a

civil penalty for willfully violating this chapter, and if the court finds that the defendant has engaged in a course of repeated and willful violations of this chapter, it may assess a civil penalty of no more than five thousand dollars. No civil penalty pursuant to this subsection may be imposed for violations of this chapter occurring more than four years before the action is brought.

**4.** The number of individual violations of the Act may actually be higher. The record suggests that Suarez sent several different solicitations to some

Act by Suarez. Rather than file 17,563 individual lawsuits, the Attorney General filed one. Applying the plain language of the statute, the court could have required Suarez to pay a civil penalty of up to $87,815,000.00. Suarez therefore "got off light" by only being assessed a $500,000.00 performance-bond penalty, a penalty that is suspended so long as Suarez follows the law in the future.

The problem with the circuit court's order in this case was not the amount of the penalty, but the lack of explanation as to how the penalty was determined. As we made clear in Syllabus Point 3 of *Fayette Co. National Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997)[5] a trial court must explain the factual and legal reasoning behind an order granting summary judgment. Because the circuit court failed to explain the basis for the suspended civil penalty against Suarez, we have reversed that portion of the summary judgment order and remanded the case for reconsideration and an explanation of the penalty.

When a trial court issues a summary judgment order imposing a civil penalty under *W.Va.Code*, 46A–7–111(2), the order becomes a public record defining the seriousness of the defendant's offense under the Consumer Credit and Protection Act and the Prizes and Gifts Act. The order must, of course, give the defendant notice of why it is being punished and how the punishment was determined. When a circuit court states specifically how and why a penalty is being imposed, then a defendant such as Suarez can understand how to correct its behavior in the future. More important, by reading the order other sweepstakes solicitors will fully understand the level of penalties they may face if they imitate such reprehensible conduct in the future.

Suarez's argument before this Court is that *W.Va.Code*, 46A–7–111(2) only authorizes one, total civil penalty of $5,000.00 upon a finding that a sweepstakes solicitor has "engaged in a course of repeated" violations. Therefore, even though Suarez bilked West Virginia consumers out of $975,389.02 through repeated, willful conduct, it argues it should only have to pay one $5,000.00 fine. As the majority opinion suggests, there is a facial appeal to this argument because the statute says a circuit court may impose a "civil penalty of no more than five thousand dollars," and does not clearly say the court can assess a "civil penalty of no more than five thousand dollars *for each violation of this chapter*." The Legislature should act to clarify *W.Va.Code*, 46A–7–111(2) with the addition of the italicized text, so that this insulting argument does not rear its ugly head in the future.[6]

of the consumers identified by the Attorney General, and some of these consumers responded to those additional solicitations. Hence, 17,722 transactions occurred with 17,563 consumers.

An *amicus* brief filed by the American Association of Retired Persons suggests that it is common for fraudulent telephone and direct-mail marketers to repeatedly send solicitations to past victims, because "dishonest promoters know that consumers who have been tricked once are likely to be tricked again." Federal Trade Commission, *Reloading Scams: Double Trouble for Consumers* (May 1998). The Federal Trade Commission refers to this practice of retargeting consumers who have lost money as "reloading" or "double-scamming:"

If you've taken the bait and lost money to a telemarketer, expect that the same or another telemarketer will try to hook you again. Consumers who have been victimized often are placed on what is known in the trade as "sucker lists" and then victimized again.... These lists, which are created, bought, and sold by some telemarketers, are invaluable because unscrupulous promoters know that consumers who have been tricked once are vulnerable to additional scams. These telemarketers hope

that consumers believe that "this time" they will win the "grand prize." Most often, however, these consumers simply lose more money.

Federal Trade Commission, *Telemarketing: Reloading & Double–Scamming Frauds* (March 1994).

5. Syllabus Point 3 of *Fayette County Nat. Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997) states:

Although our standard of review for summary judgment remains de novo, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed.

6. The language of *W.Va.Code*, 46A–7–111(2) clearly assumes that a civil penalty may be imposed for each, individual violation of the Consumer Credit and Protection Act. Other jurisdictions considering this question have consistently held that a civil penalty may be imposed for each

Suarez also contends on appeal that there was insufficient evidence to show "willful" violations of the Consumer Credit and Protection Act. "The term 'willful' ordinarily imports a knowing and intentional act, as distinguished from a negligent act." *Board of Education v. Chaddock*, 183 W.Va. 638, 640, 398 S.E.2d 120, 122 (1990) *(per curiam)*. It seems self-evident that 17,563 violations of a statute alone could constitute willful conduct—especially when those violations did not occur at one point in time, but were spread out and repeated over the course of at least a year, and occurred through the use of dozens of different solicitation letters. Moreover, there is a substantial amount of other evidence in the record to establish that Suarez's conduct was anything but accidental or negligent, and this evidence of intent can be summarized into three categories.

individual violation of a consumer protection statute. *See, e.g., State ex rel. Nixon v. Consumer Automotive Resources, Inc.*, 882 S.W.2d 717 (Mo. App.1994) (consumer protection statute authorized civil penalty up to $1,000.00 per violation; court upheld $273,600.00 penalty for unlawful pyramid scheme involving 1,368 victims, holding penalties amounted to $200.00 per person); *State ex rel. Stenberg v. American Midlands, Inc.*, 244 Neb. 887, 509 N.W.2d 633 (1994) (statute authorized $2,000.00 civil penalty per violation; court upheld penalty of $788,000.00 where 788 persons paid money to an advance fee loan scam); *People v. Dollar Rent–A–Car Systems, Inc.*, 211 Cal.App.3d 119, 259 Cal.Rptr. 191 (1989) (each of the more than 500,000 misleading or deceptive car rental contracts could justify a separate penalty; therefore, the $100,000.00 penalty was "abundantly justified"); *State ex rel. Corbin v. United Energy Corp. of America*, 151 Ariz. 45, 725 P.2d 752 (Ariz.App.1986) (the state Consumer Fraud Act allowed court to impose a civil penalty of $55,000.00, or the statutory maximum of $5,000.00 for each of 11 consumers who were victims of fraud); *People v. Toomey*, 157 Cal. App.3d 1, 203 Cal.Rptr. 642 (1984) (civil penalties for fraudulent telephone solicitations should be imposed "per victim;" because the defendant committed at least 150,000 violations of two statutes, court was justified in imposing $150,000.00 in civil penalties); *United States v. Reader's Digest Association, Inc.*, 662 F.2d 955 (3d Cir.1981) (each individual mailing of a simulated check violated the Federal Trade Commission Act; while a civil penalty could be assessed of "not more than $10,000.00 for each violation," court upheld the imposition of $1,750,000.00 penalty for one bulk mailing of simulated checks to millions of consumers); *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wash.2d 298, 553 P.2d 423, 436 (1976) (court held that

First, the founder and president of Suarez Corporation Industries is Benjamin D. Suarez. In *State by and through McGraw v. Imperial Marketing, supra*, we discussed Mr. Suarez's penchant for intentionally using deceptive marketing methods:

In his book, *7 Steps to Freedom II: How to Escape the American Rat Race*, Mr. Suarez expresses a recurrent theme of assuring the sale of a product through a mail solicitation by baiting the sale with promises of prizes and rewards and warning the consumers that if they do not purchase a product and respond within a prescribed time period, they risk forfeiture of these prizes and rewards. In a self-fulfilling prophecy, Mr. Suarez, through his company, SCI, has made fear and confusion the catalysts to assure a completed sale of whatever product is being peddled.

under Washington Consumer Protection Act, a civil penalty could be assessed for every violation of the Act, and that there could be multiple violations for each victim. The court stated that "[e]ach cause of action required respondent to prove divergent facts to establish a violation. Therefore, we hold that each cause of action is a separate violation of the consumer protection act."); *People v. Bestline Products, Inc.* 61 Cal. App.3d 879, 132 Cal.Rptr. 767 (1976) (court upheld a $1,000,000.00 civil penalty, or approximately $330.00 per violation in a pyramid promotional scheme where 3,000 consumers lost $9,000,000.00, stating that the number of violations of the statute was to be determined by the number of persons to whom misrepresentations were made).

I do not believe that Suarez has thought its argument through to its logical conclusion. Assuming Suarez's argument was correct, to avoid the argument in this case the Attorney General would have had to file 17,563 separate lawsuits to maintain an action for civil penalties for each violation. Since this one lawsuit has generated enough paperwork to fill two bankers boxes, 17,563 lawsuits would likely have a similar result—thereby filling the courthouse with over 35,000 boxes of paper. Additionally, the Attorney General would, as in this one single case, be entitled to collect the attorneys' fees and costs incurred from the extra work necessary to the filing and prosecution of these extra lawsuits. This is to say nothing for the extra litigation costs that Suarez would have incurred, and would have added a considerable sum to the $87,815,-000.00 fine that the circuit court could have imposed in the 17,563 lawsuits. I do not believe that the Legislature intended such a complicated or expensive result.

196 W.Va. at 358–59, 472 S.E.2d at 804–805. Mr. Suarez's book [7] demonstrates that the misleading statements contained in the multiple solicitations by his company to West Virginia consumers were no accident.

Second, a host of different state and federal agencies have prosecuted actions against the Suarez Corporation for its deceptive direct mailing practices. The record contains numerous court orders, administrative cease and desist orders, and consent judgments finding Suarez violated statutes prohibiting unfair or deceptive acts or practices, false advertising, or violated statutes similar to the West Virginia Consumer Credit and Protection Act.[8] All of the enforcement actions

7. Mr. Suarez has stated that "[i]t is hard to put a price on" his book, suggesting he "could easily demand thousands of dollars for this information." However, the book is currently sold by the Suarez Corporation for $32.00, and an accompanying computer software package costs $27.00.

Mr. Suarez's book has been the focus of other litigation. In February 1994, reporter Brock N. Meeks received an electronic solicitation through the Internet from EPS (the "Electric Postal Service") concerning a way to make easy cash and receive certain Internet services; all he need do is send his name and home address to EPS and details would be mailed to him.

Mr. Meeks never received the information from EPS. Instead, he received an "approved letter of requisition" in the mail to purchase Mr. Suarez's book and the associated software for $159.00. Mr. Meeks looked into EPS and discovered it was actually a subsidiary of Suarez Corporation Industries. He also learned of the many state and federal enforcement agencies that had brought actions against Suarez as a result of dubious direct mailing practices. Mr. Meeks ultimately wrote of these legal actions in an article for the March 8, 1994 edition of his Internet magazine *Cyberwire Dispatch*. In his article, Mr. Meeks accused Mr. Suarez of "attempting to pull off some kind of Internet P.T. Barnum routine" with EPS, stating he was "infamous for his questionable direct marketing scams" and "he has a mean streak."

In response to the article, Mr. Suarez sued Mr. Meeks for defamation. It appears that Mr. Suarez initially offered to settle if Mr. Meeks would apologize and say that the investigations by state and federal authorities were "sham investigations," and paying Mr. Suarez's legal fees (estimated to be $15,000.00). The case was finally settled with Mr. Meeks paying only $64.00 to cover Suarez's filing fees, and agreeing that before he publishes anything about Mr. Suarez or his company in the future, he will fax Mr. Suarez notice of the article 48 hours in advance.

8. Examples of the many regulatory actions against Suarez, found in both the court and public record, include:

— In 1978 the United States Food and Drug Administration and the Attorney General of Ohio prosecuted actions against Suarez for false labeling and advertising in selling "No–Hunger Bread," a diet-aid product Suarez also claimed could cure cancer. *United States v. No Hunger Bread distributed by American Health Foods*, No. C78–217 (U.S.D.C., N.D.Ohio); *William Brown, Attorney General of Ohio v. American Health Institute, Inc., et al.*, No. 78CV–04–1926 (Ct. of Com. Pleas, Franklin Co. Ohio).

— In 1982 and 1983, Suarez operated a mail-order marketing scheme where consumers paid $80.00 to subscribe to Suarez's International Home Shopping; the consumer was then paid $17.00 for each new subscriber recruited by the consumer. The Attorney General of Ohio filed an action under the state's Consumer Sales and Pyramid Sales Acts. On April 15, 1985, Suarez entered into a consent decree agreeing to refund membership fees. *State of Ohio ex rel. Attorney General Celebrezze v. Suarez Corporation Industries*, No. 85CV–04–1841 (Ct. of Com. Pleas, Franklin Co. Ohio).

— On November 19, 1985, the United States Postal Service filed a complaint against the "Department of Unclaimed Funds" division of Suarez's International Home Shopping. Suarez had mailed a solicitation to 1.9 million consumers suggesting the consumers were entitled to "unclaimed funds" lost in government accounts, and that for $19.00, Suarez would assist the consumer in recovering the unclaimed funds. Consumers who replied to the solicitation instead received a list of 50 state offices to write to.

— On September 22, 1986, a postal judicial officer rendered a decision holding that with this solicitation Suarez was "engaged in a scheme to obtain money through the mail by means of false representations" in violation of 39 U.S.C. § 3005. *United States Postal Service v. International Home Shopping*, Complaint No. PS 22/155. Suarez appealed the judicial officer's ruling to the United States District Court for the Northern District of Ohio. The district court upheld the Postal Service ruling on May 29, 1987. *Suarez Corporation Industries v. United States Postal Service*, No. C87–358A (U.S.D.C., N.D.Ohio). These rulings were affirmed on appeal. 869 F.2d 1493 (6th Cir.), *cert. denied*, 493 U.S. 847, 110 S.Ct. 143, 107 L.Ed.2d 101 (1989).

— The Attorney General of Indiana filed an action against Suarez for solicitations similar to those at issue in this case in November 1990. Suarez agreed to stop using the challenged solicitations, and to pay civil penalties. *State of Indiana v. Suarez Corp. Industries*, Cause No. 49D01901 1CP 1649 (Sup.Ct. of Marion Co., Indiana).

— In February 1991, the New Jersey Bureau of Securities, Division of Consumer Affairs investigated newspaper ads by Suarez offering for sale

predate the entry of summary judgment by the circuit court, and create an indisputable inference that each of the solicitations in the record was sent to 17,563 West Virginia consumers with a willful disregard for West Virginia law.

Lastly, the circuit court was, to a limited extent, justified in finding Suarez acted willfully because of the evidence in the record of Suarez's *ad hominem* attacks against the individuals who have investigated consumer complaints against Suarez. Suarez Corporation Industries and any other sweepstakes solicitor has every right to dispute a charge that it has violated a consumer protection statute. But when the litigation repeatedly expands beyond the bounds of the courtroom and into other courtrooms, and when witness and attorney intimidation becomes an element of litigation strategy, a circuit court must take careful measures to insure the integrity of the judicial system.[9]

---

a "Desert Storm" brooch and a savings bond. Because the ads failed to note the value of the bond or brooch, Suarez agreed to withdraw the ads and offer refunds to customers.

— In September 1991, the Attorney General of Idaho conducted an investigation into Suarez's solicitation activities in that state. As a result of the investigation, Suarez agreed to discontinue a mail solicitation, pay civil penalties, and offer refunds to consumers. *In the matter of Attorney General Larry Echohawk's investigation into the business practices of Suarez Corporation Industries,* Case No. 94973 (Dist. Ct. of Ada Co., Idaho).

— The Attorney General for the State of Washington commenced a consumer protection action against Suarez on December 23, 1991. That action was settled for $15,000.00, and dismissed on January 8, 1992 with the entry of a consent decree against Suarez. *State of Washington v. Suarez Corporation Industries,* No. 91–2–28185–8 (Sup.Ct. of King Co., Washington).

— On August 28, 1992, the Washington Attorney General filed a second consumer protection action against Suarez to enforce the prior consent decree, and adding additional charges. The trial court granted summary judgment to the Attorney General on February 1, 1994, noting that Suarez made fraudulent claims and solicitations indistinguishable from those in this case, such as making an "award" of a free "CZ" diamond with the requirement that the consumer purchase the gold band on which the "free" cubic zirconium gem was mounted. Other solicitations indicated the recipient could be the winner of a prize, but never stated the odds of winning the prize.

The Washington superior court imposed a suspended penalty of $500,000.00, and required Suarez to offer unconditional refunds to consumers. *State of Washington v. Suarez Corporation Industries,* No. 92–2–19598–4 (Sup.Ct. of King Co., Washington).

— The State of Connecticut brought an action similar to that filed in the State of Washington on June 22, 1994. *State of Connecticut v. Suarez Corporation Industries* (Sup.Ct., Dist. of Hartford/New Britain).

— On October 4, 1994, the United States Postal Service filed the first of a series of complaints against Suarez alleging that Suarez's sweepstakes solicitations "contain[] the elements of prize, chance and consideration and constitutes a lottery or scheme for the distribution of money or property by chance through the mails within the meaning of 39 U.S.C. § 3005." The Postal Service contended that Suarez's

> [p]romotions lead consumers to believe that some important entity, such as an accounting office, law firm or bank, is personally contacting them regarding a significant cash prize that they have won.... Consumers bombarded with these official-looking forms and documents declaring impressive prize winnings have little reason to suspect that the true purpose of the promotions is to sell them cheap merchandise at inflated prices.

*In the Matter of the Complaint Against Suarez Corporation Industries and Benjamin Suarez, d.b.a. Dept. of Sweepstakes Administration,* P.S. Docket No. FR 94–158.

The second postal complaint was filed on December 2, 1994, again alleging mail fraud violations by Suarez. *In the Matter of the Complaint against Suarez Corporation Industries and Benjamin Suarez, both d.b.a. Case, Waterman & Associates, Office of the Treasurer, Board of Currency Disbursement, Dept. of Currency Disbursement,* P.S. Docket No. FR 94–222.

The United States Postal Service then went to federal court seeking an injunction against Suarez's style of sweepstakes promotion. A temporary restraining order was issued by the district court on December 9, 1994. *United States Postal Service v. Suarez Corporation Industries,* Case No. 1:94MC727 (U.S.D.C., N.D.Ohio).

On February 26, 1995, the Postal Service and Suarez reached a settlement agreement allowing the entry of a Postal Service Order pursuant to 39 U.S.C. § 3005(a)(3). In the settlement agreement, Suarez agreed to refrain from numerous deceptive practices, and agreed that it would no longer use certain solicitations questioned by the Postal Service. It appears that several of the solicitations disputed by the Postal Service, and withdrawn by Suarez, were among the solicitations distributed to West Virginia consumers.

9. This Court has allowed circuit courts, pursuant to the *West Virginia Rules of Civil Procedure,* to take exceptional measures to preserve the integrity of the judicial system when litigants have engaged in a pattern of abusive and oppressive litigation. *See, e.g., State ex rel. McMahon v.*

For example, the record in the instant case indicates that in December 1991 and again in August 1992, the Attorney General for the State of Washington filed consumer protection lawsuits against Suarez for mailing fraudulent solicitations to Washington consumers. During the course of that litigation, Suarez "followed, harassed and threatened attorneys and investigators on the case."[10] At the conclusion of the Washington litigation in 1994, Suarez funded expensive election campaign ads attacking the Washington Attorney General.

It appears from the record that Suarez has followed a similar course of conduct in this case. Shortly after the West Virginia Attorney General's Office filed this action in August 1994, an investigator hired by Suarez appeared at a court hearing to follow and videotape the State's witnesses and several deputy attorneys general. The Attorney General subsequently filed a motion to prevent Suarez from harassing and intimidating State witnesses. Suarez also paid for numerous campaign ads attacking Attorney General McGraw in the 1996 election, and supporting his opponent.[11] Furthermore, in the

course of this consumer protection lawsuit, Suarez has filed a number of lawsuits against the Attorney General, mostly in federal court, relating to the prosecution of the instant case.[12]

The willful nature of Suarez's conduct is patently obvious from these three categories of actions, and the circuit court should consider this information in determining the need for or extent of a civil penalty under *W.Va.Code*, 46A–7–111(2). Whether the company should be punished, and the future deterrent effect of such punishment on Suarez and other sweepstakes solicitors is an issue to be considered by the circuit court on remand.[13]

## III.

### *Conclusion*

The circuit court correctly granted summary judgment to the Attorney General. The dozens of solicitations in the record from Suarez are, without question, all violative of the West Virginia Consumer Credit and Pro-

*Hamilton*, 198 W.Va. 575, 482 S.E.2d 192 (1996) (petitioner filed numerous lawsuits "in a variety of state and federal courts against a various medley of defendants, among them, federal and circuit court judges, lawyers and clerks of court" claiming various constitutional violations; under *W.Va.R.Civ.P.* Rule 17(c), Court upheld requirement that petitioner submit to a psychiatric examination to determine whether petitioner could "comprehend the meaning and effect of the countless lawsuits she has instituted for more than a decade.").

**10.** See Exhibit 3, filed with the trial court on August 29, 1994.

**11.** *See State ex rel. McGraw v. West Virginia Ethics Comm'n*, 200 W.Va. 723, 490 S.E.2d 812 (1997) (Suarez political consultant attempted to run political advertisements against Attorney General on television stations. Attorney General notified stations of litigation against Suarez, and political consultant filed an ethics complaint alleging the Attorney General abused his office).

**12.** *See, e.g., Suarez v. McGraw*, Case No. 97–CV–059 (Meigs Co. Ohio) (alleges violation of First Amendment rights); *Suarez v. McGraw*, Case No. 2:97–0038 (S.D.W.Va.1997) (alleges violation of First Amendment rights); *Suarez v. McGraw*, Case No. 2:96–1950 (S.D.W.Va.1996) (alleges violation of First Amendment rights; case has been dismissed); *Suarez Corporation Industries v.*

*McGraw, et al.*, Case No. 2:95–0248 (S.D.W.Va. 1995) (complaint alleges various tortious actions during the course of this case; for a discussion, see *Suarez Corporation Industries v. McGraw*, 125 F.3d 222 (1997)); and *Better Government Bureau, Inc. v. McGraw*, Case No. 2:94–0952 (S.D.W.Va. 1994) (alleging the Attorney General violated Suarez's First Amendment rights by forming the "Better Government Bureau, Office of the Attorney General, State of West Virginia," thereby preventing Suarez's political "watchdog" group "Better Government Bureau" from incorporating in West Virginia. A jury verdict was returned for the Attorney General. For details, *see Better Government Bureau, Inc., v. McGraw*, 904 F.Supp. 540 (1995); 924 F.Supp. 724 (1996); 924 F.Supp. 729 (1996) and *In re Allen*, 106 F.3d 582 (4th Cir.1997), *rehearing en banc denied*, 119 F.3d 1129).

**13.** Consumers injured under the Consumer Credit and Protection Act are entitled to pre-judgment and post-judgment interest of 10% per year. *W.Va.Code*, 56–6–31 [1981]. Hence, it appears from the record that Suarez is currently liable for over $600,000.00 in interest in addition to the principal amount of $975,389.02, as well as all fees and costs of litigation.

Therefore, whether a $500,000.00 "suspended penalty" is sufficient to secure Suarez's future good behavior is questionable.

tection Act and the Prizes and Gifts Act. The fact that *some* consumers weren't mislead by the solicitations is irrelevant; the question is, could a reasonable, prudent consumer be mislead by the solicitation? Because the willfully misleading nature of the solicitations is apparent, there was no material issue remaining for trial.

To correct this situation, the circuit court was within its power to grant a permanent injunction against Suarez prohibiting the use of misleading solicitations, and requiring that all 17,563 consumers who received and responded to one or more of the dozens of solicitations be reimbursed and compensated for their losses. The circuit court was further within its power to impose a civil penalty up to $5,000.00 for each violation of our consumer protection laws; the court must, however, state its reasoning for the penalty in the record.

I therefore concur with the majority's opinion.